IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.            :            CIVIL ACTION
                                :
                                :
        v.                      :
                                :
                                :
KATHLEEN KANE, et al.           :            NO. 15-6082

MEMORANDUM

Bartle, J.                                   July 19, 2016

        Plaintiff are Frank Noonan ("Noonan"), Randy Feathers
("Feathers"), Richard A. Sheetz, Jr. ("Sheetz"), E. Marc Costanzo
("Costanzo"), and Frank Fina ("Fina"), four of whom are former high
level employees of the Office of the Attorney General of
Pennsylvania ("OAC") and one of whom is a retired Commissioner of
the Pennsylvania State Police.  They have filed this action
against:  Pennsylvania Attorney General Kathleen Kane ("Kane");
Michael Miletto ("Miletto"), an investigator for the Office of the
Attorney General; the Philadelphia Daily News; one of its
reporters, Christopher Brennan ("Brennan"); and Philadelphia Media
Network, LLC and Philadelphia Media Network (Digital) LLC, which
together own the Philadelphia Daily News.

        Noonan is the retired Commissioner of the Pennsylvania
State Police.  Feathers is a retired Regional Director of the
Bureau of Narcotics and Investigation and Control of the OAG.
Sheetz served as a former Executive Deputy Attorney General

Directing the Criminal Law Division of the OAG.  Costanzo is a former Deputy Attorney General for the OAG.  Finally, Fina is a former Chief Deputy Attorney General for the OAG.[1]  All five plaintiffs are citizens of the Commonwealth of Pennsylvania.

Plaintiffs sue Kane under 42 U.S.C. § 1983.  They allege that she retaliated against them for engaging in speech protected by the First Amendment.  Costanzo and Fina also plead that Kane, Miletto, and Brennan conspired to retaliate against them for the same protected speech.  Finally, Costanzo and Fina assert defamation and false light claims under Pennsylvania law against Brennan, Philadelphia Media Network, LLC and Philadelphia Media Network (Digital) LLC.  We have supplemental jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1367.

Before the court are three motions filed by Kane, Miletto, and the Media Defendants (Brennan, the Philadelphia Daily News, Philadelphia Media Network (Digital) LLC, and Philadelphia Media Network LLC) to dismiss plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Kane and Miletto also rely on the doctrine of qualified immunity.

---

1.  Although Feathers, Sheetz, Costanzo, and Fina no longer work at the OAG, their pleading does not make clear precisely when their employment with the OAG ended.  What is clear is that each of these four plaintiffs left the OAG either before Kane took office or shortly thereafter.

-2-

Kane further argues that the First Amended Complaint does not meet the pleading requirements under Rule 8(a).

I.

The facts set forth in the First Amended Complaint, taken in the light most favorable to plaintiffs, are as follows.

In early 2012, Kane announced her candidacy to become Attorney General of Pennsylvania.  During her campaign, Kane criticized the OAG for its handling of the high-profile investigation and subsequent prosecution of Jerry Sandusky ("Sandusky"), a Penn State University football coach who was ultimately convicted in June 2012 of sexually abusing minors.  Plaintiffs had all been involved in the Sandusky investigation during the time that Thomas Corbett was the Attorney General.  While campaigning, Kane declared that the OAG had improperly delayed in charging Sandusky and had devoted inadequate resources to the investigation.  She promised to initiate an investigation into the handling of the Sandusky case by the OAG if elected.  In response, Feathers made public statements refuting Kane's claims and deriding her as uninformed.  Likewise, Costanzo "openly expressed criticism of Kane's campaign tactics regarding the Sandusky prosecution."  Kane won the election in November 2012 and assumed office in January 2013.

Upon taking office, Kane also put a halt to a long-running bribery investigation in which plaintiffs had been

involved.  In furtherance of that investigation, the OAG had been
relying on an informant named Tyron Ali ("Ali").  Ali had entered
into a cooperation agreement with the OAG pursuant to which he
would identify Philadelphia elected officials who were prepared to
accept bribes.  In exchange, the OAG would not pursue charges
against Ali.

When Kane assumed office in early 2013, Fina informed
her that he believed she could not oversee the Ali investigation
because it had the potential to implicate Joshua Morrow ("Morrow"),
a friend, supporter, and former campaign employee of Kane.  Kane
disagreed and retained control of the investigation.

In September 2013, Kane made clear that she would not
pursue the bribery investigation, nor would she honor Ali's
cooperation agreement.  In response, Ali moved for Kane's recusal
and for enforcement of the agreement.  Fina executed an affidavit
in support of Ali's motion.  In it, Fina attested to his knowledge
of the purported conflict of interest, the investigation, and the
cooperation agreement.

Kane ultimately relented, dismissing all charges against
Ali.  However, beginning in late 2013 and continuing into early
2014, she expressed publicly that the Ali bribery investigation had
been racially motivated, that Ali was not credible, and that the
investigation lacked "quality" and had inadequate resources.  She
reported that federal law enforcement officials had characterized

-4-

the case as "flawed and not prosecutable" and stated that Ali and
the lead case agent both believed the investigation to be focused
on members of the General Assembly's Black Caucus.  In addition,
Kane implied that Fina was to blame for the public disclosure of
the investigation.  Plaintiffs allege that these statements were
false.  Fina responded to them in what plaintiffs characterize as a
"letter of March 22, 2014 to the public."  Meanwhile, Fina, Noonan,
and Sheetz made public statements refuting Kane's accusations.
Around the same time, Kane emailed a media strategist regarding
reports of her role in the Ali investigation.  In the email, Kane
justified her accusations that the investigation was racially
motived by stating:  "This is war."

        Ultimately, Philadelphia District Attorney Seth Williams
("Williams") took over the Ali bribery investigation.  Williams
reviewed the evidence and found no indication that the
investigation was racially motivated.  He brought charges against
six elected officials, five of whom have pleaded guilty.

        Meanwhile, Kane fulfilled her campaign promise to
initiate an inquiry into the Sandusky investigation.  Fina, who was
contacted as part of the inquiry, openly questioned the legality of
Kane's inquiry and Kane's authority to conduct it.  Fina also
directed "a variety [of] letters . . . and motions" to Geoffrey
Moulton ("Moulton"), the attorney in the OAG directing the inquiry,
and to the grand jury judge supervising it.

A report of the inquiry into the Sandusky investigation was completed by Moulton in May 2014.  Pursuant to the protocol established by the grand jury judge who was supervising the inquiry, Noonan, Feathers, Sheetz, and Fina had the opportunity to respond to the Moulton report.  They did so in June 2014. Plaintiffs criticized the inquiry as "ill-advised" and contended that it had been "born of political opportunism and posturing." They also called the claims that had given rise to the report "ill-informed and unfounded."  The report, according to plaintiffs, was merely an "exercise in second guessing" undertaken "to sift for criticism."  These responses were incorporated into a final version of the report.

On June 23, 2014, the day the final report was released, Kane convened a press conference.  Speaking to reporters, she stated that the actions of Noonan, Feathers, Sheetz, and Fina had led to delays in the Sandusky investigation.  As a result, Kane contended, Sandusky had been afforded the opportunity to molest two minors who would not have been victimized if the investigation had proceeded more quickly.  According to plaintiffs, this statement was false.  Indeed, Kane later acknowledged through a spokesperson that the statement was untrue.

In response, plaintiffs convened a press conference of their own.  Fina told reporters that the inquiry into the Sandusky investigation "was a campaign promise [Kane] made.  It was a trick

-6-

she used to get elected and Moulton didn't deliver for her.  What's she going to do?  She has to come up with something else sensational to detract that she [made] a series of falsehoods to the public during the campaign."

Plaintiffs plead that Kane retaliated against them for criticizing her.  As alleged in the First Amended Complaint, Kane "initiated a conspiracy" in 2014 to release grand jury information related to a 2009 criminal investigation which had been run by Fina.  That investigation involved the late J. Whyatt Mondesire ("Mondesire"), the former head of the Philadelphia Chapter of the N.A.A.C.P.  The OAG suspected that state grant money had improperly been used to make payments to Mondesire.  The investigation stalled, however, when key witnesses who were under indictment refused to testify before a grand jury.  The OAG concluded that Mondesire would not consent to appear before a grand jury and that subpoenaing him would be impracticable.  As a result, the investigation effectively became dormant.

Upon learning of the status of the Mondesire investigation, Kane gathered confidential grand jury documents related to that case and turned them over to her associate Morrow. She instructed Morrow to forward the materials to defendant Brennan, the reporter, with whom Morrow had a professional relationship.  Morrow redacted from the materials the names of all individuals other than Costanzo and Fina.  Upon receiving the

materials, Brennan wrote a story which suggested that Costanzo and Fina had impeded and improperly terminated the Mondesire investigation.  The story was published by the <u>Philadelphia Daily News</u> in June 2014.  Since that time, the <u>Philadelphia Daily News</u> has printed "numerous" articles critical of Fina and Costanzo.

According to plaintiffs, Kane thereafter "conspired with [defendant] Miletto," who was then employed by the OAG, by directing Miletto to state that he had uncovered evidence of Mondesire's wrongdoing and that Costanzo and Fina had removed him from the Mondesire investigation as a result.  Plaintiffs allege that this claim was false.

When Costanzo and Fina became aware in May 2014 of the release of the grand jury information, they reported it to the Supervising Judge of the grand jury, who initiated an investigation into the alleged leak.  Costanzo and Fina were subpoenaed to testify before the grand jury as part of that investigation.  On August 26, 2014, the day they were to appear, they were confronted by defendant Miletto and several other OAG agents at the entrance to the building in which the grand jury convened.  Plaintiffs maintain that Miletto "made intimidating, threatening and harassing statements toward Fina and Costanzo."  Miletto and the agents then followed Costanzo and Fina into an elevator, where Miletto "attempted to physically intimidate, threaten and harass Fina."  Costanzo and Fina reported this incident to the judge supervising

the grand jury, who later took evidence concerning the alleged intimidation and issued a protective order.

Since that time, Kane has been criminally charged for her role in the release of the grand jury materials and for lying to a grand jury about the disclosure.  She has stated publicly and in "numerous . . . verified court filings" that Costanzo and Fina were part of a "conspiracy," "plot," or "scheme" to "corruptly" manufacture the grand jury investigation of her activities.

Meanwhile, the OAG, having concluded its inquiry into the Sandusky investigation, had come into possession of a large volume of emails that had been received and sent by OAG staff while the Sandusky investigation was taking place.[2]  Among those emails, plaintiffs assert, were messages received and sent by plaintiffs containing pornographic images.  Plaintiffs allege that Kane, embarrassed by the investigation into her role in the Mondesire grand jury leak and by the disclosure that her statements about Sandusky's victims had been untrue, "sought a way to utilize these emails to retaliate" against them.  They contend, upon information and belief, that in summer 2014, Kane "instructed members of her staff to contact members of the media and suggest to them that e-mails existed for which they should make a Right to Know Law

_____

2.  Although plaintiffs repeatedly characterize these messages as their "private emails," they do not appear to dispute defendants' observation that the messages were received and sent using the "Pennsylvania OAG computer systems and email accounts."

request." Members of the press made such requests, and the OAG challenged them. The OAG contended that release of the emails was not mandated because they were not part of the public record.

While the debate over the release of the emails was ongoing, a colleague of Fina met with David Tyler ("Tyler"), the OAG's Chief Operating Officer. Tyler told Fina's colleague that many former members of the OAG legal staff would be hurt, apparently by their involvement in the email scandal, if "Fina does not back off." At around the same time, another of Fina's colleagues met with James Barker ("Barker"), Chief Deputy Attorney General for Appeals and Legal Services. Barker instructed Fina's colleague to tell Fina that if Fina continued to criticize Kane, Kane would release emails of former members of the OAG staff.

Ultimately, in September 2014 Kane released some but not all of the emails sought by the press. Plaintiffs allege that she did so selectively and in such a way as to paint them in a negative light. They claim that "[t]hose selected by Kane to have their emails released had either spoken out against Kane during her campaign or in connection with the Sandusky investigation, or were friends or professional associates of" plaintiffs.

The release of the emails garnered significant media attention. The Philadelphia Daily News published a profusion of articles and editorials regarding the participation of Costanzo and Fina in the email scandal. This reporting suggested that Costanzo

-10-

and Fina were the primary distributors of the offending emails and
that they had engaged in workplace discrimination.  Plaintiffs
insist that this was untrue.  In addition, the articles in the
Philadelphia Daily News frequently failed to mention that Costanzo
and Fina were only two of more than 100 recipients of the
pornographic email chains.  According to plaintiffs, when the Media
Defendants learned in June 2015 that this action was forthcoming,
Costanzo and Fina were targeted "in articles and editorials with a
focus and ferocity."  Plaintiffs claim that the Media Defendants
"vastly overstate[d] the roles of Fina and Costanzo as the primary
responsible persons."  The First Amended Complaint details multiple
examples of the news stories with which plaintiffs take issue.

        Kane, meanwhile, was scheduled to testify before a grand
jury on November 17, 2014.  Allegedly in anticipation of the
negative press coverage that would result, Kane approached CNN
about a possible story regarding the email scandal.  The resulting
segment was broadcast on November 18, 2014.  It included an
interview with Kane in which she allegedly "knowingly, willfully
and intentionally made false statements that were defamatory and
cast Fina, Feathers and Noonan in a false light."

        Plaintiffs contend that Kane stated in the CNN interview
that the offending emails had included child pornography.  They
also claim that she implied that Noonan, Feathers, Sheetz, and Fina
had viewed such material.  They elaborate by including in their

-11-

First Amended Complaint a transcript of the CNN segment.  The transcript reveals that a CNN correspondent declared during the segment that Kane "claims that many of the officials who worked on the Sandusky sex abuse case were at the exact same time breaking the law by using their work computers to share hardcore porn." Another correspondent then asserted that state officials "who worked to bring down the infamous child molester Jerry Sandusky have been caught exchanging crude pornographic emails written on state email accounts, state computers and on state time, according to the state's [A]ttorney [G]eneral . . . the porn being passed around was not for the faint of heart."  Later in the segment, Kane stated:  "When I saw [the images in the emails], they literally took my breath away.  And they are deplorable.  Hardcore, graphic, sometimes violent emails that had a string of videos and pictures depicting sometimes children, old women, some of them involved violent sexual acts against women."  A correspondent then reports that "[t]hose involved in the scandal include some of the biggest names in Pennsylvania's justice system, a state Supreme Court Justice Seamus McCaffery, the State Police Commissioner Frank Noonan and one of the main Sandusky investigators Randy Feathers."

The CNN segment also reported that Kane was unable to investigate the distribution of the emails due to a gag order that had been imposed as an indirect result of the

> public and very bitter feud between . . . Kane
> and the main prosecutor in the Sandusky case
> Frank Fina. . . . The two have been lobbying
> [sic] allegations against each other about
> whether several cases have been handled
> correctly.  As a result, Kane is now being
> investigated about whether she improperly leaked
> a memo about a case from 2009 that Fina handled.
> . . . [A] gag order in that case is keeping Kane
> from moving forward.

In addition, the commentator mentioned Noonan again, noting that

while many involved in the scandal had lost their jobs, Noonan

"still has his job because . . . the governor says there was no

proof that he opened the emails."  At various points throughout the

segment, photographs of Noonan, Feathers, and Fina were displayed.

After the CNN segment was aired, a spokesperson for Kane

clarified that there was no child pornography in any of the emails

at issue.

II.

When ruling on a Rule 12(b)(6) motion to dismiss, the

court must accept as true all factual allegations in the

complaint and draw all inferences in the light most favorable to

the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224,

233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d

59, 64 (3d Cir. 2008).  We must then determine whether the

pleading at issue "contain[s] sufficient factual matter,

accepted as true, to 'state a claim for relief that is plausible

on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
In making our determination, we may also consider matters of
public record as well as any "undisputedly authentic document
that a defendant attaches as an exhibit to a motion to dismiss
if the plaintiff's claims are based on that document." Pension
Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d
1192, 1196 (3d Cir. 1993).

        In order to survive a Rule 12(b)(6) motion to dismiss,
a claim must do more than raise a "mere possibility of
misconduct." Fowler v. UPMC Shadyside, 578 F.3d 203, 210
(3d Cir. 2009) (quoting Iqbal, 556 U.S. at 679).  Under this
standard, "[t]hreadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not
suffice." Iqbal, 556 U.S. at 678.  Instead, the complaint must
contain factual matter sufficient to state a claim that is
facially plausible, meaning that "the plaintiff [has] plead[ed]
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." Id. (citing Twombly, 550 U.S. at 556).  This
plausibility standard "is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully." Id.  A complaint which
"pleads facts that are 'merely consistent with' a defendant's

-14-

liability . . . 'stops short of the line between possibility and plausibility.'"  Id. (citing Twombly, 550 U.S. at 557).

III.

Kane has moved to dismiss Count One of the First Amended Complaint for failure to state a claim under § 1983. [3]  In Count One, Fina pleads that Kane's criticism of the OAG's handling of the Ali bribery investigation constituted unlawful retaliation for his exercise of his First Amendment rights.  Specifically, Fina alleges that Kane "fabricat[ed] and publish[ed] claims that the OAG possessed evidence that the [Ali investigation] was motivated by racism" in retaliation against Fina's protected speech. He appears to contend that his act of highlighting the termination of the Ali investigation and Kane's potential conflict of interest with

---

3.  Counts One through Six are all pleaded under 42 U.S.C. § 1983.  That section establishes in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 does not create substantive rights in and of itself, but instead provides a remedy for violations of constitutional or other federally established rights.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

respect to that matter motivated Kane unlawfully to retaliate against him.

It is well-established that "an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274 (1977)). In order properly to plead a First Amendment retaliation claim pursuant to § 1983, a plaintiff must allege "(1) that [the plaintiff] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).

Kane concedes that Fina and his fellow plaintiffs engaged in protected activity, and she does not appear to dispute the existence of a causal connection between this activity and her purported retaliation. See Lauren W., 480 F.3d at 267. Thus we must simply determine whether plaintiffs have adequately alleged that Kane's actions were "sufficient to deter a person of ordinary firmness from exercising his or her rights." See id. In making this determination, we "focus[] on the status of the speaker, the

-16-

status of the retaliator, the relationship between the speaker and
the retaliator, *and the nature of the retaliatory acts*." Brennan
v. Norton, 350 F.3d 399, 419 (3d Cir. 2000) (quoting Suarez Corp.
Indus. V. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)); see also
Koren v. Noonan, 586 F. App'x 885, 888 (3d Cir. 2014).  When the
alleged retaliator is a public employer, "courts have required the
nature of the retaliatory acts . . . to be more than *de minimis* or
trivial."  Brennan, 350 F.3d at 419 (quoting Suarez, 202 F.3d at
686).  "[C]riticism, false accusations, or verbal reprimands" are
generally not considered sufficient to establish a claim. Id.
(quoting Suarez, 202 F.3d at 686); see also Koren, 586 F. App'x at
888.

        In analyzing First Amendment retaliation claims, our
Court of Appeals has repeatedly cited with approval the
well-reasoned decision of the Fourth Circuit in Suarez, 202 F.3d
676.  See, e.g., Brennan, 350 F.3d at 419; Koren, 586 F. App'x at
888; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006);
McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001).  In Suarez,
the Court reviewed a district court ruling that a First Amendment
retaliation claim raised by a direct mail marketing company against
state officials was not barred by the doctrine of qualified
immunity.  202 F.3d at 683-84.  The Suarez court reversed.  It
concluded that the claim could not proceed because the alleged
retaliatory conduct had not adversely affected the First Amendment

rights of the plaintiffs.  See id. at 690-91.  In so doing, the court observed that when a First Amendment retaliation claim arises in the public employment context, the relationship between the speaker and the retaliator "creates competing interests between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees."  Id. at 686 (internal citation omitted).  It is because of these competing interests that the retaliatory acts must be "more than de minimis or trivial" to give rise to a viable claim.  Id.  Under this standard, criticism and false accusations are insufficient.  See id.

     According to the Suarez court, "[t]he nature of the alleged retaliatory acts has particular significance where the public official's acts are in the form of speech."  Id. at 687. Under such circumstances, the "public official's own First Amendment speech rights are implicated."  Id.  Consequently, "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow, such speech does not adversely affect a citizen's First Amendment rights, even if defamatory."  Id. (emphasis added) (citations omitted).

-18-

The Court of Appeals for the Third Circuit recently cited Suarez with approval in Koren, 586 F. App'x 885. There, a former Pennsylvania State Trooper brought a First Amendment retaliation action under § 1983 against two Pennsylvania State Police employees.[4] Id. at 886-87. He alleged that while he was running for political office they had implied in statements to the media that he had engaged in workplace misconduct. Id. at 887. The Court of Appeals affirmed the district court's dismissal of the claim. Id. at 890. It observed that "in the political arena, courts have consistently rejected First Amendment retaliation claims based upon assertions of purportedly false reports or criticism." Id. at 888. Because the defendants' allegedly retaliatory speech "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action [would] imminently follow,'" the court concluded that it "would not dissuade a person of ordinary firmness from" engaging in the type of protected activity undertaken by the plaintiff. Id. (quoting Suarez, 202 F.3d at 687).

Like the purported retaliation in Suarez and Koren, the criticism by Kane of the Ali bribery investigation is not actionable under § 1983. See generally 202 F.3d 676; 586 F. App'x 885. In reaching this conclusion, we consider the status

---

4.  One of those two employees happened to be the same Frank Noonan who is a plaintiff in this action.

of Fina as the speaker, the status of Kane as the alleged
retaliator, the relationship between them, and the nature of Kane's
acts.  See Brennan, 350 F.3d at 419.  Fina, a Deputy Attorney
General under Attorney General Corbett, was a high-level official
in the OAG during the time the Ali investigation was ongoing.  Kane
at the relevant time was the elected Attorney General.  It bears
noting that in this capacity, Kane enjoys her own First Amendment
rights.  See Suarez, 202 F.3d at 687.  Fina does not allege that
there was an employment relationship between himself and Kane at
the time of the alleged retaliation.  Even if there was such a
relationship, the nature of Kane's alleged acts is different from
that of the retaliation that occurred in the employment cases cited
by plaintiffs.  Fina was not terminated, demoted, disciplined, or
subjected to any other adverse employment action as a result of his
criticism of Kane.  Instead, he merely bore the effects of a
generalized critique of an investigation in which he took part
under a former Attorney General.  In sum, the actions of Kane
detailed in Count One would not "deter a person of ordinary
firmness from exercising his constitutional rights."  See, e.g.,
Thomas, 463 F.3d at 296.

        Plaintiffs urge us to distinguish Koren.  In their view,
the retaliation alleged in Koren took place in the political arena,
while this case arises in an employment context.  It is true that
in Koren the Third Circuit acknowledged that when a public employer

-20-

takes action against an employee, the threshold for finding that
action to be retaliatory is "very low."  586 F. App'x at 888
(quoting O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir.
2006)).  But even under such circumstances, the court wrote, "a
plaintiff must plead more than mere 'criticism, false accusations,
or verbal reprimands.'"  Id. (quoting Brennan, 350 F.3d at 419.
Moreover, in support of their argument that this case takes place
in the employment context, plaintiffs rely on cases which involve
retaliatory adverse employment action such as demotion or
termination.  See, e.g., O'Connor, 440 F.3d at 126 n.1.  No such
adverse employment action was taken here.

        Moreover, the retaliation described in Count One "is in
the nature of speech," and Fina alleges no "threat, coercion, or
intimidation intimating that punishment, sanction, or adverse
regulatory action will immediately follow."  See Suarez, 202 F.3d
at 687.  Rather, Kane's purportedly retaliatory acts are no more
than "criticism, false accusations, or verbal reprimands."  See
Brennan, 350 F.3d at 419.  Accordingly, even if that speech is
defamatory, as Fina claims it is, it does not implicate his First
Amendment rights.  See Suarez, 202 F.3d at 687; Koren, 586 F. App'x
at 888.  We will therefore grant the motion of Kane to dismiss
Count One.

IV.

Kane also seeks to dismiss Count Two of the First Amended Complaint. Count Two, brought under § 1983, contains the allegations of Costanzo and Fina that Kane once again retaliated against them in violation of the First Amendment by "fabricating and publishing claims that Fina and Costanzo wrongfully impeded and terminated a valid criminal investigation against J. Whyatt Mondesire for improper and unethical purposes." Costanzo and Fina also allege that Kane retaliated against them by unlawfully releasing grand jury materials related to the Mondesire investigation. They argue that Kane did so in retaliation for their criticism of her handling of the Ali bribery investigation and "in an attempt to make it appear that [they] had abused their prosecutorial discretion by failing to pursue a case against Mondesire."

Once again, Kane does not appear to dispute that Costanzo and Fina engaged in protected activity or that there is a a causal connection between this activity and her purported retaliation. Thus, our inquiry is again limited to whether Kane's actions would "deter a person of ordinary firmness from exercising his constitutional rights." See, e.g., Thomas, 463 F.3d at 296.

To the extent that Count Two is based on speech by Kane, we reiterate that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or

intimidation intimating that punishment, sanction, or adverse
regulatory action will immediately follow, such speech does not
adversely affect a citizen's First Amendment rights, even if
defamatory." Suarez, 202 F.3d at 687.  As Kane correctly observes,
she is entitled to make clear to the public that she, as the
current Attorney General, "thinks that the OAG was either corrupt
or inept before she took office and that Fina and Costanzo were
part of the problem."  Any statement made or initiated by Kane to
the effect that the Mondesire investigation was improperly
terminated was not "sufficient to deter a person of ordinary
fitness from exercising" his First Amendment freedoms.  See, e.g.,
Thomas, 463 F.3d at 296.

    As to Costanzo and Fina's allegations that Kane
retaliated against them through the unlawful release of materials
from the Mondesire grand jury investigation, we likewise conclude
that they have not made out a First Amendment retaliation claim.
It is true that this alleged leak goes beyond mere speech and that
Kane has been criminally charged in connection with it.  To
determine whether it amounts to retaliation, however, we must
assess "the status of the speaker, the status of the retaliator,
the relationship between the speaker and the retaliator, and the
nature of the retaliatory acts." Brennan, 350 F.3d at 419
(citation omitted).  The First Amended Complaint does not allege
that Kane released the grand jury materials selectively in such a

-23-

way as to misrepresent Costanzo and Fina's involvement in the investigation.  Indeed, plaintiffs merely aver that Kane gathered grand jury materials and gave them to her associate Morrow, who passed them along to Brennan.  It was Morrow, and not Kane, who "consciously redacted from these documents the names of all persons other than Costanzo and Fina so that the reported story would only be about them."  Morrow also "told Brennan that he and Kane were looking to air a story critical of Fina and Costanzo."  Plaintiffs do not allege that Morrow did so at Kane's direction.

In summary, Fina and Costanzo have failed adequately to allege that Kane unlawfully retaliated against them by criticizing their handling of the Mondesire investigation or by releasing confidential materials related to that investigation.  As a result, we will grant the motion of Kane to dismiss Count Two.

V.

In Count Three, which Kane, Miletto, and Brennan seek to dismiss, Costanzo and Fina aver under § 1983 that Kane, Miletto, and Brennan conspired to retaliate against them for exercising their First Amendment freedoms by fabricating assertions that they had improperly "impeded and terminated" the Mondesire investigation.  This claim appears to be based on the following allegations:  that Kane directed Miletto to state falsely that Costanzo and Fina had removed him from the Mondesire investigation after he uncovered evidence of

-24-

Mondesire's wrongdoing, and that Brennan reported this fabrication; and that Brennan received confidential grand jury materials from Morrow and, at Morrow's request, used them as the basis for a story.

For the reasons stated above, the criticism and allegedly false accusations levied by Kane, Miletto, Morrow, and Brennan against Costanzo and Fina are not enough to establish a First Amendment retaliation claim.  These acts are mere speech and do not involve any "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow."  See Suarez, 202 F.3d at 687; Koren, 586 F. App'x at 888.[5]  They are not enough to "deter a person of ordinary firmness from exercising his constitutional rights."  See, e.g., Thomas, 463 F.3d at 296.  Since they are not retaliatory, they cannot serve as the basis for a claim that defendants conspired to retaliate against them.

The same is true of the allegations that Kane, Miletto, and Brennan conspired to engage in retaliation by releasing confidential grand jury materials.  We have already concluded that

---

5.  Costanzo and Fina do allege that Miletto later threatened and intimidated them in connection with the grand jury investigation when he confronted them as they prepared to testify about the leak.  This allegation does not appear to serve as the basis for the conspiracy claim in Count Three. Moreover, even if plaintiffs do base Count Three on this alleged intimidation, they have not alleged that Miletto conspired with Kane or Brennan to engage in this course of conduct.

any such leak does not amount to retaliation, and as such, it cannot support a retaliation conspiracy claim.

We also note that plaintiffs have not adequately alleged the existence of a conspiracy, at least with respect to defendant Brennan.  Nowhere in their First Amended Complaint do plaintiffs allege in anything more than conclusory terms that Brennan conspired with Kane or Miletto to engage in unlawful conduct.  See Iqbal, 556 U.S. at 678.  Plaintiffs aver that Brennan, at Morrow's direction, wrote a news story critical of Costanzo and Fina, but they do not allege any involvement by Kane or Miletto in this purported scheme.  As to Miletto, plaintiffs plead his involvement in a conspiracy only by asserting that Kane directed him to "falsely state that Fina and Costanzo had removed him from the Mondesire investigation when Miletto supposedly found evidence of Mondesire's wrongdoing which was ultimately reported by Brennan in the news story."  Again, this is not actionable retaliation, and cannot support a claim of a retaliatory conspiracy.

We will thus grant the motions of Kane, Miletto, and Brennan to dismiss Count Three.

VI.

Kane further moves to dismiss Count Four.  Again, this count is predicated on § 1983.  There Noonan, Feathers, Sheetz, and Fina claim that Kane retaliated against them in violation of the First Amendment by making a statement "to the media that the

-26-

alleged delay in arresting Sandusky resulted in two minors being subjected to sexual abuse that would not have otherwise occurred." That assertion, as Kane's representative later acknowledged, was untrue.  Noonan, Feathers, Sheetz, and Fina aver that when Kane made the statement she was retaliating against them for their criticism of the inquiry she had initiated into the Sandusky investigation.

In Koren, our Court of Appeals opined that when a court is confronted with allegations that a defendant has "smeared [a plaintiff's] unblemished professional record . . . [t]he question . . . is not whether [the] remarks were defamatory – it is whether they would have deterred 'a person of ordinary firmness'" from exercising his constitutional rights. 586 F. App'x at 888 (quoting Thomas, 463 F.3d at 296).  While plaintiffs engaged in protected activity (as Kane concedes they did), and while Kane's contentions about the delays in the Sandusky investigation may have been false and damaging, those contentions "involved no 'threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow.'"  See id. (quoting Suarez, 202 F.3d at 687).  They were merely the remarks of an elected official about persons she considered to be her political opponents pertaining to an issue which had been at the core of her campaign for office.  They would not "dissuade a person of

-27-

ordinary firmness" from engaging in the type of protected speech at issue here, and as a result, they are not actionable under § 1983.  See id.  For this reason, we will grant the motion of Kane to dismiss Count Four.

VII.

Kane moves to dismiss Count Five.  This count under § 1983 consists of the allegations of Noonan, Feathers, Sheetz, and Fina that Kane retaliated against them for engaging in First-Amendment-protected speech by "fabricating and publishing claims that implied that Fina, Sheetz, Feathers, and Noonan possessed and/or distributed child pornography."  Plaintiffs are referring to the statements made by Kane to a CNN correspondent, allegedly in retaliation for plaintiffs' criticism of her.  They were broadcast in a news segment which aired on November 18, 2014.  Once again, Kane concedes that plaintiffs' criticism of her was protected by the First Amendment, and she does not appear to dispute that there was a causal connection between this criticism and her statements.

We reiterate that under these circumstances, where Kane's purportedly retaliatory acts are "in the form of speech," her First Amendment rights are implicated as well.  See Suarez, 202 F.3d at 687.  The criticisms Kane articulated during the CNN segment, which appear to serve as the sole basis for Count Five, do not involve any "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately

-28-

follow." See id.  Again, Kane's comments were those of an elected official concerning the improper use of state computers and state email servers.  Even if Kane had defamed Noonan, Feathers, Sheetz, and Fina by falsely asserting that they had viewed child pornography, this would not be actionable First Amendment retaliation under § 1983.  See id.

In response to Kane's argument that her statements to CNN involved no threats or intimidation, Noonan, Feathers, Sheetz, and Fina contend that they were subjected to threats in connection with their involvement in the email scandal.  Specifically, they plead that Tyler, an OAG official, threatened the release of the emails "if Fina does not back off."  They further allege that Barker, another OAG official, directed Fina's colleague to instruct Fina that his criticism of Kane would result in the release of the emails.  It is unclear which count (if any) in the First Amended Complaint relies on these allegations.  Moreover, there is no indication in the First Amended Complaint that any defendant directed or played any role in the issuance of these alleged threats.  Thus, they cannot serve as the basis for a claim in this action.

For the foregoing reasons we will grant the motion of Kane for dismissal of Count Five.

VIII.

This brings us to Count Six, which Kane asks us to dismiss as not stating a claim under § 1983.  In Count Six, all five plaintiffs plead that Kane again retaliated against their engagement in protected speech by "releasing the information about the private emails and/or releasing the emails of all plaintiffs." They take issue with the OAG's "selective" release of certain of their emails to the press following the filing of Right to Know Law requests concerning the communications.

Once again, in assessing whether the alleged retaliatory acts of Kane were "sufficient to determine a person of ordinary firmness from exercising" his constitutional rights, we "focus[] on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*." Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.  Here, the speakers – in this case plaintiffs – are former high ranking public officials, and the retaliator Kane is an elected Attorney General who plays a major role in state law enforcement and who is tasked with directing the OAG.  The alleged retaliatory act at issue was the release to the media, pursuant to an official request and after significant litigation, of sexually explicit messages which plaintiffs do not dispute were exchanged on state email systems. In other words, the "nature of the retaliatory acts" was in this

-30-

case the disclosure by the state's Attorney General of official
misconduct within her office.  See id.  It would defy logic to
conclude that Kane violated the constitutional rights of plaintiffs
by bringing to light their use of state-owned computers and email
systems to exchange pornography.

In arguing otherwise, plaintiffs direct our attention to
the decision of the District of Delaware in Neuberger v. Gordon,
567 F. Supp. 2d 622 (D. Del. 2008).  In that case, a civil rights
attorney who had been critical of certain public figures brought a
First Amendment retaliation case against them after they disclosed
his private medical information to the media.  That disclosure, the
court concluded, was "sufficient to deter a civil rights
plaintiff's attorney of ordinary firmness from exercising
constitutional rights."  Id. at 638.  Plaintiffs contend that
Neuberger stands for the proposition that the disclosure of private
information about a plaintiff can support a First Amendment
retaliation claim.

Neuberger, however, is of no help to plaintiffs.  That
case involved the widespread dissemination of highly intimate
medical information about the plaintiff.  Here, in contrast, the
materials released were off-color and arguably pornographic
messages sent by state officials on state-owned email servers.  The
facts of Neuberger are easily distinguishable from those before us
in this matter.

-31-

In sum, when we consider "the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, *and the nature of the retaliatory acts*," we have no trouble concluding that Kane's release of certain emails implicating plaintiffs was not "sufficient to determine a person of ordinary firmness from exercising" his right to free speech. See Thomas, 463 F.3d at 296; Brennan, 350 F.3d at 419.

To the extent that Count Six relies on allegations that plaintiffs were threatened with the release of their emails, we note once again that the First Amended Complaint contains no allegations that any defendant made or directed these threats. While plaintiffs may believe that Kane arranged for these purported threats to be made, they have not alleged this in their pleading.

Accordingly, we will grant the motion of Kane to dismiss Count Six.

IX.

In essence, the First Amended Complaint details a long-standing political battle between the Attorney General of Pennsylvania and former high-ranking state officials who served in the administrations of her adversaries.  The battle has been hard fought and is not pretty.  Each party, however, has exercised his or her rights under the First Amendment, and there has been alleged no illegal retaliation giving rise to claims under § 1983.

-32-

X.

As we have concluded that Rule 12(b)(6) requires dismissal of Counts One through Six, there are no remaining claims against Kane and Miletto.  We need not reach their arguments that they are entitled to qualified immunity from all of the claims against them, nor must we address the argument of Kane that the First Amended Complaint should be dismissed on the ground that it runs afoul of the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure.

XI.

Finally, we address Counts Seven and Eight, in which Costanzo and Fina state law claims of defamation and false light against the Media Defendants whose citizenship is not diverse from that of the plaintiffs.  Our subject matter jurisdiction over these claims rests on 28 U.S.C. § 1367.[6]

---

6.  Section 1367 provides in relevant part:

> (a) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
>
> . . .
>
> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –

All the federal claims are being dismissed.  Pursuant to 28 U.S.C. § 1367(c)(3), we decline to exercise supplemental jurisdiction over Counts Seven and Eight.  The action is in a very early stage.  Consequently, Counts Seven and Eight will be dismissed without prejudice to the right of plaintiffs to reassert these claims in the appropriate state court.

---

. . .

    (3) the district court has dismissed all claims over which it has original jurisdiction.