IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.              :         CIVIL ACTION
                                  :
         v.                       :
                                  :
KATHLEEN KANE, et al.             :         NO. 15-6082

MEMORANDUM

Bartle, J.                                        March 29, 2018

         Plaintiffs Frank Noonan, Randy Feathers, Richard A.
Sheetz, Jr., E. Marc Costanzo, and Frank Fina have filed this
action under 42 U.S.C. § 1983 against Kathleen Kane, the former
Pennsylvania Attorney General, and against Michael Miletto, an
investigator in the Office of the Attorney General ("OAG").  The
gravamen of the five counts against Kane is that she retaliated
against the plaintiffs for engaging in speech protected by the
First Amendment as incorporated in the Fourteenth Amendment.  Fina
and Costanzo also plead in a separate count that Kane and Miletto
conspired to retaliate against them for protected speech.[1]

_____

1.  Fina and Costanzo also asserted state law claims of defamation
and false light against the Philadelphia Media Network, LLC, and
Philadelphia Media Network (Digital) LLC, which together own the
Philadelphia Daily News, and a reporter Christopher Brennan
(collectively the "Media Defendants").  The court declined to
exercise supplemental jurisdiction over the two state law claims
under 28 U.S.C. § 1367 asserted against the Media Defendants.
While the matter was on appeal, the parties stipulated to the
dismissal of the Media Defendants from this action.  Thus the two
state law claims in the First Amended Complaint, which name only
these defendants, are no longer a part of this action.

This court dismissed the § 1983 claims for failure to state a claim upon which relief can be granted.  It did not reach defendants' argument that they are entitled to qualified immunity.  Our Court of Appeals reversed and remanded.  Noonan v. Kane, 698 F. App'x 49 (3d Cir. 2017).  In its non-precedential opinion, it held that plaintiffs "have alleged a colorable claim of retaliation in violation of their First Amendment rights."  Id. at 54.  In doing so, it referred to three different threats made by Kane, her subordinates, and/or Miletto.  The Court of Appeals noted that on remand it was for the district court to consider the issue of qualified immunity in the first instance.

Significantly, the Court of Appeals stated that it was not clear whether certain plaintiffs were employees of the OAG under defendant Kane at the time of the events alleged in the First Amended Complaint.  The Court directed, "This is fact-finding that the District Court should make in the first instance."  Id. at 55 n. 3.  On remand, this court held a phone conference with counsel who all agreed that there is no dispute as to the employment status of plaintiffs at the times relevant here.  The parties thereafter filed stipulations as to these facts, and the court has incorporated these facts into this memorandum.

We now must decide whether the defendants are shielded from liability on each of plaintiffs' claims based on the bar of qualified immunity.  In doing so, we now have relevant information

-2-

about the employment status of the plaintiffs which was not previously in the possession of the Court of Appeals or this court.

I

For purposes of deciding the issue of qualified immunity on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiff. Mammaro v. N.J. Div. of Child Prot. and Permanency, 814 F.3d 164, 166 (3d Cir. 2016). We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. In making our determination, we may also consider matters of public record as well as any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on that document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

-3-

The conduct of defendants Kane and Miletto that is the subject of the First Amended Complaint took place between February 2012, when Kane announced her candidacy for Attorney General of Pennsylvania, and approximately November 2014.[2] Kane was elected Attorney General in November 2012 for a four year term and took office on January 15, 2013. We take judicial notice that she resigned on August 17, 2016.

Plaintiff Noonan served as the Commissioner of the Pennsylvania State Police from January 18, 2011 to January 18, 2015. He was appointed to that position by the Governor and confirmed by the State Senate. 71 Pa. Const. Stat. §§ 61, 67.1, 251. In that role, he served as a member of the Governor's cabinet. 71 Pa. Const. Stat. § 784.7. Noonan was not employed by or under the authority or control of the Attorney General, who is independently elected. Pa Const. art. IV § 4.1; 71 Pa. Const. Stat. § 732-201.

Feathers served as the Regional Director of the Bureau of Narcotics Investigation and Drug Control of the OAG from January 25, 1988 to October 12, 2012. From August 17, 1987 to January 4, 2013, Sheetz served as the Executive Deputy Attorney

---

2. The First Amended Complaint alleges that <u>The Philadelphia Daily News</u> continued publishing articles related to the plaintiffs through December 2015. As previously noted, the state law claims that reference the Media Defendants and these events have been dismissed by agreement of the parties.

General of the Criminal Law Division of the OAG. Costanzo was a
Deputy Attorney General of the OAG from August 1993 to January 4,
2013. Fina was employed by the OAG from March 18, 2002 to
January 18, 2013, ultimately reaching the position of Chief Deputy
Attorney General. While Feathers, Sheetz, and Costanzo had all
been employed by and had served under prior Attorney Generals, they
all had left the OAG before Kane was sworn in. Fina had likewise
served under prior Attorney Generals and had resigned from his
latest post three days after Kane took office.

Plaintiffs' averments stem from a series of acrimonious
encounters they had with Kane. The first began while Kane was on
the campaign trail in 2012. At that time, she criticized the OAG's
handling of the investigation into allegations that former Penn
State football coach Jerry Sandusky had been sexually abusing young
boys for a period of years dating back to 1994.[3] Kane promised to
initiate her own inquiry into the investigation once she took
office. Fina and Costanzo, who were involved in the original
investigation, openly criticized Kane's statements and campaign
tactics.

The conflict continued after Kane became Attorney
General in January 2013 and initiated her own inquiry into the
Sandusky matter. Her inquiry was completed by May 2014 and a

3. On June 22, 2012 Sandusky was convicted of forty-five counts
of sexual abuse charges related to these allegations. Later that
year he was sentenced to thirty to sixty years in prison.

report on the original Sandusky investigation was prepared by an OAG attorney, Geoffrey Moulton, Jr. After reviewing the report, Fina, Sheetz, Feathers, and Noonan, none of whom was then employed in the OAG, slammed the inquiry as "ill-advised" and announced that it had been "born of political opportunism and posturing." They viewed the Moulton report as an "exercise in second guessing" undertaken to "sift for criticism." They described Kane's claims that gave rise to the report as "ill-informed and unfounded." Plaintiffs' responses, by court order, were incorporated into the final version of the Moulton report, which was made public on June 23, 2014, well over a year after Kane became Attorney General. That same day during a press conference, Kane accused Noonan, Fina, Sheetz, and Feathers of delaying the original investigation. According to Kane, the delay allowed Sandusky to molest two additional victims. Plaintiffs condemned this statement as false, and Kane later acknowledged its falsity. Fina, Feathers, and Noonan fired back at a press conference by criticizing Kane and denouncing her statements as untruthful.

Meanwhile, Kane was overseeing another OAG investigation in which Fina and Costanzo had been involved, and again further strife erupted between plaintiffs and Kane. This investigation concerned certain members of the Pennsylvania General Assembly from Philadelphia who were suspected of taking bribes. Confidential informant Tyron Ali had agreed to assist the OAG investigation in

exchange for the OAG dropping criminal charges against him. After Kane became Attorney General, Fina discovered that Kane had a conflict of interest in the investigation. Fina asserted that Kane had a professional relationship with at least two individuals who Ali had identified in connection with his work in the bribery investigation. One of these individual was Joshua Morrow. Through Morrow, Ali had made contributions in cash and by check in the names of straw donors to a political candidate. After Ali was arrested, Morrow returned the checks to Ali. Morrow later became a paid employee of Kane's campaign staff and also made contributions to her campaign.

Fina brought this conflict of interest to Kane's attention, but she ignored it. Instead, she declined to continue the bribery investigation against the legislators and initially refused to drop the charges against Ali. Fina thereafter brought the conflict of interest to the attention of the judge supervising the grand jury related to the investigation.

In March 2014 Kane began publicly criticizing the bribery investigation and insinuated that the investigation was racially motivated. She stated that she had information that the bribery investigation targeted members of the legislative Black Caucus. Fina alleges that Kane's comments were intended to damage

his reputation and cast him as racist.  He made public statements refuting Kane's allegations.[4]

Further jousting occurred between Kane and Fina and Costanzo at some point after Kane took office over a 2009 OAG investigation concerning J. Whyatt Mondesire, the former head of the Philadelphia chapter of the NAACP.  That investigation, in which Fina and Costanzo had been involved, had stalled due to the unavailability of witness testimony.  Kane, through an associate, gave confidential grand jury material to a reporter for the Philadelphia Daily News, who wrote an article suggesting that Fina and Costanzo had improperly terminated the investigation.  This article, written at Kane's direction, was published in June 2014. Further, Kane and Miletto conspired to retaliate against Fina and Costanzo when Kane had Miletto fabricate a story that Miletto had uncovered evidence of Fina and Costanzo's wrongdoing in the Mondesire investigation.  According to the story, Fina and Costanzo removed Miletto from the investigation after they discovered that Miletto knew of their obstruction.

In 2014, Fina and Costanzo alerted the supervising judge of the Mondesire grand jury to the leak of confidential grand jury information.  On the day in August 2014 when Fina and Costanzo were scheduled to testify before the grand jury on this issue, they were

_____

4.  The First Amended Complaint does not specify when Fina refuted Kane's comments.

met in an elevator by Miletto and others who threatened them with physical harm.  The supervising judge thereafter entered a protective order to prevent future intimidation.

Meanwhile, sometime after Kane took office but prior to May 2014, Kane was alerted to emails containing pornographic images sent among OAG officials and others outside of the OAG using OAG email accounts in connection with the original Sandusky investigation.[5]  Plaintiffs were among the individuals in the email chains.  There were two encounters between Kane's subordinates and Fina's colleagues in which Kane's subordinates threatened plaintiffs for Fina's criticism and actions relating to Kane's leak of Mondesire grand jury material.  In the first encounter in the summer of 2014, one of Kane's subordinates, David Tyler, the Chief Operating Officer of the OAG, threatened that "a lot of those people [former OAG staff] are going to be hurt if 'Fina does not back off.'"  In the second encounter in August of 2014, James Barker, the Chief Deputy Attorney General for Appeals and Legal Services of the OAG, relayed that "if Fina did not stop criticizing Kane, Kane would release the private emails of the former OAG staff."  As the Court of Appeals has interpreted the First Amended

_____

5.  The First Amended Complaint avers that the emails were discovered during her staff's review of the prior Sandusky investigation.  The Moulton report of the prior Sandusky investigation was completed by May 2014.

Complaint, the subordinates made these statements at Kane's direction.

Kane was advised that she could not lawfully release the emails in a selective manner and that the emails were not subject to public release under Pennsylvania law.[6] Nonetheless, she released a portion of the emails of Fina, Costanzo, Feathers, Sheetz, and Noonan in September 2014. Kane did so in a selective way in order to portray plaintiffs in a false light and depict them as participants in the possession and distribution of child pornography. In November 2014 during a nationally-broadcasted interview following the release, Kane insinuated that Fina, Feathers, Sheetz, and Noonan were involved in possessing and distributing child pornography using their government work computers.

The First Amended Complaint details six counts asserting violations under § 1983: (1) in Count One Fina alleges that Kane retaliated against him by publicly declaring that the Ali bribery investigation, that is the investigation of the Philadelphia legislators, was racially motivated in order to cast Fina as racist; (2) in Count Two Fina and Costanzo assert that Kane retaliated against them by releasing confidential grand jury

---

6. The First Amended Complaint does not specify from whom she obtained this legal advice. However it alleges that Kane had argued before the Commonwealth Court of Pennsylvania the opposite position – that these emails were not public records and were not subject to release under Pennsylvania law.

material from the Mondesire investigation and by having her
subordinates threaten to harm them by releasing their emails
containing pornographic images if Fina did not stop criticizing
Kane; (3) Fina and Costanzo allege in Count Three that Kane and
Miletto conspired to retaliate against them by fabricating a story
relayed to a reporter suggesting that Fina and Costanzo had
improperly stalled the Mondesire grand jury investigation, had
improperly removed Miletto from the investigation, and had Miletto
threaten Fina and Costanzo physically in order to prevent them from
testifying in a grand jury regarding the leak of Mondesire grand
jury material; (4) Fina, Sheetz, Feathers, and Noonan aver in Count
Four that Kane retaliated against them by publicly criticizing
their conduct in the Jerry Sandusky investigation; (5) in Count
Five, Fina, Sheetz, Feathers, and Noonan aver that Kane retaliated
against them by publicly suggesting that plaintiffs distributed
through emails child pornography; and (6) in Count Six all five
plaintiffs contend that Kane retaliated against them by directing
her subordinates to threaten to harm them if Fina did not stop
criticizing her and by casting them in a false light through
selectively releasing their emails.

Our Court of Appeals, as noted above, pointed to three
specific instances described in the First Amended Complaint in
which plaintiffs alleged that Kane, Miletto, or subordinates at
their direction threatened them.  Reading the First Amended

Complaint broadly, two of those threats are relevant to Counts Two, Three, and Six since the threats related to both the Mondesire grand jury leak and the release of the emails containing pornographic images.  The Chief Operating Officer of the OAG first threatened in the summer of 2014 that "a lot of those people [former OAG staff] are going to be hurt if 'Fina does not back off'" with respect to Fina's comments regarding the Mondesire grand jury leak.  The Chief Deputy Attorney General for Appeals and Legal Services of the OAG, in August of 2014 also threatened that "if Fina did not stop criticizing Kane, Kane would release the private emails of the former OAG staff."

The final threat relates to Counts Two and Three brought by Fina and Costanzo against Kane and Miletto and involves the Mondesire grand jury leak.  In this threat, Miletto physically threatened and intimidated Fina and Costanzo in August 2014 in the elevator when they were going to testify before the grand jury concerning the leak.

Our Court of Appeals observed in connection with the threats: "[w]hether that retaliation would deter a person of ordinary firmness from exercising [their First Amendment rights] is a question to be decided by the factfinder and not discarded so early."  Noonan, 698 F. App'x at 54.

-12-

Preliminarily we note that § 1983, under which each of the six counts is pleaded, does not create a substantive right in and of itself, but rather provides a remedy for a violation of underlying constitutional or other federally established rights.[7] Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). There can be no § 1983 claim unless the alleged violation of a constitutional or federal right is committed by a person acting under color of state law. Id. The First Amended Complaint identifies Kane as the Pennsylvania Attorney General and Miletto as an investigator in the OAG.

Our Court of Appeals has determined without a discussion of each of the separate counts that plaintiffs have pleaded colorable claims of First Amendment retaliation. Noonan, 698 F. App'x at 54; see also Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). To plead a viable retaliation claim under the

---

7. The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

First Amendment, "a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Id. (citation omitted).  As observed by the Court of Appeals, the parties agreed for present purposes that plaintiffs have satisfied the first and last elements of the claims.  Id. at 53.  The second element is the one in dispute.  To plead a retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, a plaintiff must allege and ultimately prove that a public official's speech "involve[d] a 'threat, coercion, or intimidation' by the official that will follow from the continued exercise of a plaintiff's First Amendment rights."  Id. at 54 (quoting Mirabella v. Villard, 853 F.3d 641, 651 (3d Cir. 2017)).  The standard that we must apply is an objective one.  Mirabella, 853 F.3d at 650.

IV

        We now turn to the issue of qualified immunity, which had been left unresolved.  Qualified immunity, which defendants assert, is an affirmative defense.  Crawford-El v. Britton, 523 U.S. 574, 587 (1998) (citing Gomez v. Toledo, 446 U.S. 635, 639-41 (1980)).  It protects all officers in the executive branch of government performing discretionary functions.  Id.  The doctrine of qualified immunity shields government officials from

-14-

money damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citation omitted).

The Supreme Court has explained, "To be clearly established, a right must be sufficiently clear that every 'reasonable official would [have understood] that what [the official] is doing violates that right.'" Reichle v. Howards, 566 U.S. 658, 664 (quoting al-Kidd, 563 U.S. at 741) (internal citation and quotation omitted). Specifically, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (emphasis added). Further, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741. Nonetheless, a right can be clearly established without "a case directly on point." Id.

We first look for Supreme Court precedents to determine if a right was clearly established at the time of the conduct in question. Mirabella, 853 F.3d at 648. If there is none, we may rely on a "'robust consensus of cases of persuasive authority' in the Court[s] of Appeals" to determine whether the right has been established for purposes of qualified immunity. Mammaro, 814 F.3d

at 169 (quoting <u>Taylor v. Barkes</u>, 135 S.Ct. 2042, 2044 (2015)).  It

is not necessary that "the very action in question" has been

previously found unlawful, but "in the light of pre-existing law,

the unlawfulness must be apparent." <u>Anderson</u>, 483 U.S. at 640.

As the Supreme Court has cautioned, "it is vital to

note [that determining whether the right was clearly

established], must be undertaken in light of the specific

context of the case, not as a broad proposition[.]" <u>Saucier v.</u>

<u>Katz</u>, 533 U.S. 194, 201 (2001); <u>Zaloga v. Borough of Moosic</u>,

841 F.3d 170, 174 (3d Cir. 2016).  We must not "define clearly

established law at a high level of generality." <u>al-Kidd</u>,

563 U.S. at 742.  The "clearly established" standard is an

"exacting standard" that requires "some degree of specificity in

the law . . . before a right is said to be 'clearly

established.'" <u>Zaloga</u>, 841 F.3d at 175.  As noted by our Court

of Appeals in <u>Zaloga</u>, "The Supreme Court has repeatedly stressed

that, for purposes of determining whether a right is so well

settled as to defeat qualified immunity, it 'must be established

not as a broad general proposition, but in a particularized

sense so that the contours of the right are clear to a

reasonable official[.]'" <u>Id.</u> (quoting <u>Reichle</u>, 566 U.S. at 665

(internal quotation marks and citations omitted)).

The plaintiffs have pleaded claims of retaliation for

exercise of their free speech rights under the First Amendment.

For purposes of qualified immunity we must determine whether the right in question was clearly established "in a particularized sense."  Zaloga, 841 F.3d at 175.

As our Court of Appeals has recognized, defamatory speech is an integral part of plaintiffs' claims.  Thus, we must examine any relevant Supreme Court precedent for guidance as to whether defamation may be the basis for an action under § 1983. In Paul v. Davis, 424 U.S. 693 (1976), the plaintiff, a photographer for a local newspaper, sued various area police chiefs under § 1983 for distributing flyers of known shoplifters to local merchants.  The flyers falsely included a picture of the plaintiff and described him as an "active shoplifter." While he had been charged with shoplifting, the case had not been finally resolved at the time the flyers were distributed (thereafter the charges were dismissed).  Id. at 695.  The plaintiff's supervisor learned of the flyers.  Although he did not fire the plaintiff from his job, he warned plaintiff against finding himself in that situation again.  The Paul Court observed that the case law "does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."  Id. at 702.  As such, "defamatory publications, however seriously they may [harm plaintiff's]

-17-

. . . reputation, [do] not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause." Id. at 712. Otherwise, the state tort of defamation would be transformed into a federal § 1983 claim. In sum, harm to reputation alone is insufficient to establish a federal constitutional claim.

Next we turn to relevant decisions from the Third Circuit in the non-employment context, that is where, as here, the plaintiffs were not employees subject to the control of the defendant public official. In R.C. Maxwell Co. v. Borough of New Hope, 735 F.2d 85 (3d Cir. 1984), the defendant Borough council wrote to a billboard owner urging it to remove certain billboards and threatened litigation if this was not done. The owner, who removed the billboards, did so in part because of its desire to stay in the Borough's "good graces." Id. at 87. The plaintiff, who had leased billboard space from the owner, sued the Borough for violation of its First Amendment right to free speech, contending that the defendant coerced the billboard owner to remove the billboards. The Court of Appeals affirmed summary judgment in favor of the defendant and concluded that the Borough's actions did not "coerce" the owner such that a constitutional violation occurred. Id. at 89.

In McLaughlin v. Watson, 271 F.3d 566 (3d Cir. 2001), agents of the Pennsylvania Attorney General's Office alleged that

-18-

the then-United States Attorney for the Eastern District of
Pennsylvania intentionally impeded one of their criminal
investigations and through conversations with their employer, the
Pennsylvania Attorney General, influenced the Attorney General to
impose "adverse employment conditions" on them, such as how often
they were required to travel, loss of promotional opportunities,
and changes in their work shifts and overtime.  The plaintiffs
brought claims averring that, among other things, the United
States Attorney had violated their First Amendment rights.  Id. at
568.

          The district court denied the motion of the defendant to
dismiss the complaint on the ground that he was entitled to
qualified immunity.  The Court of Appeals reversed.  It determined
that the defendant was entitled to qualified immunity since he did
not violate a clearly established constitutional right.  Id. at
572.  The Court observed that the defendant had "no reason to
believe that requesting or influencing another's employer to take
adverse personnel action violated first amendment [sic] rights"
and noted that a public official's own right to free speech is
implicated when the alleged improper conduct takes the form of
speech.  Id. at 573-74.  Accordingly, when a public official is
sued for "allegedly causing a third party to take some type of
adverse action against plaintiff's speech . . . [i]t is not enough
that defendant speaks critically of plaintiff or even that

-19-

defendant directly urges or influences the third party to take action." Id. at 573. Instead, the defendant "must 'threaten' or 'coerce' the third party to act." Id.

In Zaloga v. Borough of Moosic, 841 F.3d 170 (3d Cir. 2016), a physician owned a company that contracted with Lackawanna County to provide medical services for the county prison. As a result of a dispute with a neighbor that the Borough did not rectify, the physician launched political attacks on the president of the Borough council and publicly opposed his reelection. Thereafter, the council president pressured the county to discontinue its contractual relationship with the physician's company. Id. at 172-73. Specifically, the president attempted to block the company's contract renewal by "demand[ing] that the [prison board members] oppose [the company's] upcoming contract renewal" in exchange for his support of their reelection campaigns. Id. at 173. Nonetheless, the county voted unanimously to renew the contract. Prior to the contract renewal, the physician and his company brought a § 1983 action against the council president, among others, alleging that he had violated the plaintiffs' First Amendment right of free speech by pressuring the county to discontinue the contractual relationship. Id. 172-73.

The Court of Appeals reversed the district court's summary judgment determination that the council president was

not entitled to qualified immunity.  The Zaloga Court cautioned against defining the right in question for qualified immunity purposes as the right against government retaliation for exercising one's right to free speech and instructed that, "[i]nstead, we must attend to context[.]"  Id. at 175.  The Court noted that the defendant did not himself have the power to take adverse action against the plaintiff and that when a public official's retaliation is merely speaking out critically, "the official's 'own First Amendment speech rights are implicated.'"  Id. at 176 (quoting McLaughlin, 271 F.3d at 573).  The Zaloga Court concluded that "there is ample room to debate whether a reasonable official would have known that such threats, without any evident coercive power, were constitutionally out of bounds."  Id. at 177.  Significantly, the Court declared, "it has never been established that a government official who does not himself retaliate but instead pressures another individual to retaliate . . . can be held personally liable."  Id.

       In Mirabella v. Villard, 853 F.3d 641 (3d Cir. 2017), township residents petitioned their local government for help with a dispute with their neighbors and simultaneously threatened the local government with litigation.  A local government official subsequently responded via email and barred the residents from directly communicating with any member of the local government other than its counsel and threatened to move

for sanctions against the residents if they commenced
litigation.  Thereafter the township residents brought a § 1983
action against local government officials for First Amendment
retaliation for barring them from directly communicating with
the officials and for violating their First Amendment right to
petition the government.  Id. at 647.

In reversing the district court's denial of qualified
immunity, the Court of Appeals determined that although the
plaintiffs alleged a First Amendment retaliation claim at the
motion to dismiss stage, the right was not clearly established
for the purpose of qualified immunity.  Id. at 653.  It defined
the right at issue "as the right to be free from a retaliatory
restriction on communication with one's government, when the
plaintiff has threatened or engaged in litigation against the
government."  Id.  The Court stated that plaintiffs "have
identified neither Supreme Court precedent nor a robust
consensus of cases of persuasive authority" in support of their
argument that the defendants were not entitled to qualified
immunity.  Id. (internal citation and quotation omitted).

In Koren v. Noonan, 586 F. App'x 885 (3d Cir. 2014), a
former Pennsylvania State Trooper running for political office
alleged in a § 1983 action that two employees of the
Pennsylvania State Police "by thinly veiled innuendo, smeared
his unblemished professional record in an attempt to derail his

ongoing candidacy." The plaintiff had not received an honorable
discharge from his position with the Pennsylvania State Police.
During the plaintiff's political campaign for the office of
District Attorney of Lehigh County, one defendant, purportedly a
spokesperson for the State Police, stated that "an honorable
discharge is generally given when a trooper 'did not engage in
serious misconduct while employed' by state police, and the
'vast majority' of troopers retire with an honorable discharge."
Id. at 886. The plaintiff contended that at the time of his
retirement, the State Police had no policy governing the
designation of honorable discharge and instead it was given at
the discretion of the other defendant, the State Police
Commissioner. The State Police declined to release the
plaintiff's personnel file to the public and after the plaintiff
lost the election, on a second determination he was again denied
an honorable discharge. Id. at 886-87.

The plaintiff claimed that defendants' retaliation for
the exercise of his First Amendment rights had a negative impact
on his bid for political office. The Koren Court affirmed the
district court's dismissal of the complaint under Rule 12(b)(6).
The Court of Appeals reasoned that since the defendants' conduct
involved no threat, coercion, or intimidation that punishment,
sanction, or adverse regulatory action would imminently follow,
a person of ordinary firmness would not be dissuaded from

seeking political office.  Id.  Consequently, the plaintiff had

failed to allege a § 1983 claim for First Amendment retaliation.

Finally, one additional decision from our Court of

Appeals is worthy of note.  This one is in the public employment

context.  In Schleig v. Borough of Nazareth, 695 F. App'x 26

(3d Cir. 2017), a defendant police officer threatened a plaintiff

police officer with termination, physical violence, and death, for

the plaintiff's involvement in police union activities and the

defendant's suspicion that the plaintiff had helped another

officer obtain evidence for a lawsuit against the police

department.  The defendant confronted the plaintiff and told him

that he intended to "get the [suspected] individual fired, file

criminal charges against the individual for alleged theft, and

further go after the individual physically and cause them [sic]

severe harm as well as severe harm to the individual's family."

Id. at 28.  The defendant threatened that he and the chief of

police would "end the alleged culprit's life[.]"  Id.  The

plaintiff filed a § 1983 action alleging that the defendant had

conspired to violate and had violated his First Amendment rights

to free speech, free association, and the ability to petition for

redress of grievances.  Id.

The Court of Appeals affirmed the district court's

determination that the defendants were not entitled to qualified

immunity at the motion to dismiss stage.  The Court stated that

-24-

the plaintiff had made a claim of First Amendment retaliation and that the defendant had violated clearly established law, that is the defendant threatened that harm or death would follow as a direct result of the plaintiff's union activities. Id. at 32. The Court of Appeals ruled that the defendant officer's threats against the plaintiff constituted "textbook retaliatory speech, and every reasonable official in [his] shoes would have understood that what he [was] doing violated [plaintiff's] right against retaliation." Id. at 29. It noted that "[T]he threat of dismissal from public employment . . . is a potent means of inhibiting speech" and "threat of dismissal, depending on its clarity and credibility, can form the basis for a claim of retaliation in violation of the First Amendment." Id. at 30 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 574 (1968)).

V

In light of these precedents we now review each of the plaintiffs' claims in the First Amended Complaint to determine whether the defendants are protected by qualified immunity as to that claim. In doing so, we must at this stage accept as true all well-pleaded facts. None of the plaintiffs, we reiterate, was ever in the employ or under the control of defendants Kane or Miletto at any relevant time.

In Count One, Fina alleges that Kane retaliated against him for his criticism of her for ending a long-running

investigation of certain members of the Pennsylvania General
Assembly from Philadelphia for taking bribes and for her failure
to support a cooperating witness, Tyron Ali, against those
legislators.  Fina criticized Kane for her conflict of interest in
connection with the investigation and publicly revealed this
conflict.  In September 2013, he filed an affidavit in support of
Ali's motion to recuse Kane from the case and to compel
performance of a cooperation agreement entered into with Ali.  In
November 2013, Kane dropped the charges against the legislators
and initially declined to drop charges against Ali.  In
March 2014, Kane falsely implied that Fina had publicly disclosed
Ali's undercover efforts.  She further retaliated publicly against
Fina by calling the investigation, which he led, racially
motivated, and suggesting that Fina was a racist.  All of these
events occurred before the summer of 2014 and before any of the
three threats alleged in the First Amended Complaint were made.

        In a count such as this where Fina is challenging the
speech of a public official, we must of course be cognizant that
the public official also has rights under the First Amendment.
McLaughlin, 271 F.3d at 573; Zaloga, 841 F.3d at 170.  It is when
speech crosses the line and becomes a threat, coercion, or
intimidation that claims of retaliation under § 1983 become
viable.  Mirabella, 853 F.3d at 651.  While falsely tarnishing a
person as a racist is reprehensible and for present purposes will

be treated as defamatory, the Supreme Court has ruled that defamation or false accusations alone without affecting some tangible interest such as employment is not a basis for a claim under § 1983. See Paul, 424 U.S. at 702. Otherwise, state law of defamation without more will simply become a basis of a § 1983 action. Significantly, Fina was not an employee of the OAG at the time of Kane's alleged retaliation, and he makes no claim in Count One that his employment or any other tangible interest was in any way threatened or affected. Paul, 424 U.S. at 702. Fina does not allege any threat, coercion, or intimidation. Mirabella, 853 F.3d at 651.

We have found no case law, and none has been cited, which clearly establishes a constitutional violation when as here one public official simply calls a former public official a derogatory or defamatory term, such as a racist, in connection with the latter's then-public duties. Accordingly, Count One of the First Amended Complaint, brought by Fina alone, will be dismissed.

In Count Two, Fina and Costanzo allege that Kane retaliated against them for outing her conflict of interest in the bribery investigation of the Philadelphia legislators involving cooperating witness Tyron Ali, more specifically that she had a professional relationship with Joshua Morrow, who Ali had paid cash and contributions to in connection with the investigation.

As part of her retaliation, in March 2014 she had an associate leak to the press confidential grand jury information from a 2009 investigation into J. Whyatt Mondesire.  The purpose of this leak was to produce a news article suggesting that Fina and Costanzo, prosecutors on the case, had improperly stalled the Mondesire investigation, when in fact the investigation came to a halt due to a lack of leads in uncovering evidence.  Fina and Costanzo aver damage to their reputations as prosecutors as result of the leak.

Fina and Costanzo further allege in Count Two that subordinates of Kane threatened on two occasions to harm them if Fina did not stop criticizing Kane's leak of the Mondesire grand jury material.  Specifically in the summer of 2014, David Tyler, the Chief Operating Officer of the OAG, warned that "a lot of "a lot of those people [former OAG staff] are going to be hurt if 'Fina does not back off.'"  We interpret "those people" to include Costanzo, who had worked with Fina on the Mondesire matter.  Later in August of 2014, James Barker, the Chief Deputy Attorney General for Appeals and Legal Services of the OAG, promised that "if Fina did not stop criticizing Kane, Kane would release the private emails of the former OAG staff."  The Court of Appeals has read the First Amended Complaint as implicating Kane in these threats.

Read together the threats crossed the line from protected First Amendment speech by Kane to speech threatening harm.  Mirabella, 853 F.3d at 651; Schleig, 695 F. App'x at 29.

It is well established that where a public official's
retaliation includes a "threat, coercion, or intimidation
intimating that punishment, sanction, or adverse regulatory
action will imminently follow, that speech does not adversely
affect a citizen's First Amendment rights, even if defamatory."
Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir.
2000).  Accordingly, the allegations of Fina and Costanzo
against Kane in Count Two state a violation of a clearly
established right, and Kane is not entitled to qualified
immunity with respect to these threats.

          As in Count Two, in Count Three Fina and Costanzo allege
that in March 2014 Kane retaliated against them for Fina's
involvement in publicly revealing her conflict of interest in the
bribery investigation of the Philadelphia legislators.  Count
Three also avers that Kane and defendant Michael Miletto conspired
to retaliate against Fina and Costanzo for Fina's conduct.
Specifically, in retaliation Kane directed Miletto to leak a story
to the press that in 2009 Miletto had uncovered misconduct by Fina
and Constanzo in connection with the Mondesire investigation.  As
part of the fabricated story published in June 2014, Miletto
stated at Kane's direction that when Fina and Costanzo discovered
that Miletto had uncovered their wrongdoing, they removed him from
the investigation.

Fina and Costanzo further allege that they were retaliated against by Kane and Miletto after they reported the leak of the Mondesire grand jury material to the supervising judge of the grand jury. The two were then subpoenaed to testify on August 26, 2014 before a grand jury about their knowledge of the leak. On their way to testify, they were met in the elevator by Miletto and others who "attempted to physically intimidate, threaten and harass Fina while he was in the elevator."

In addition that summer they were retaliated against, as previously described in Count Two, by Kane directing her subordinates to promise that "a lot of those people [former OAG staff] are going to be hurt if 'Fina does not back off'" and warn that "if Fina did not stop criticizing Kane, Kane would release the private emails of the former OAG staff."

While the threat in the elevator as described in the First Amended Complaint specifically references only Fina, Costanzo is also a plaintiff in this count. We read the threat also to encompass Costanzo. As we did in Count Two, we read the threats by Kane's subordinates to encompass both Fina and Costanzo.

Courtroom testimony has long been recognized as protected speech. See, e.g., Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996). "The duty to testify has long been recognized as a basic obligation that every citizen owes to his Government."

-30-

United States v. Calandra, 414 U.S. 338, 345 (1974); see also
Reilly v. Atlantic City, 532 F.3d 216, 228 (3d Cir. 2008).  It
goes without saying that a public official is prohibited from
threatening or intimidating a grand jury witness.  Schleig,
695 F. App'x at 31-32; Santiago v. Blair, 707 F.3d 984, 992
(8th Cir. 2013); Van Deelen v. Johnson, 497 F.3d 1151, 1157
(10th Cir. 2007).  Any reasonable public official would know that
it is clearly established that it is a constitutional violation
for a public official to threaten physical or other harm to an
individual who is going to testify before the grand jury.
Schleig, 695 F. App'x at 31-32; Santiago, 707 F.3d at 992; Van
Deelen, 497 F.3d at 1157.  Accordingly, Kane and Miletto are not
entitled to qualified immunity on Count Three for the First
Amendment retaliation and conspiracy to retaliate claims of Fina
and Costanzo.

     In Count Four, Fina, Sheetz, Feathers, and Noonan
assert that in June 2014 Kane retaliated against them by making
a public statement that their investigation into the Jerry
Sandusky sexual abuse scandal was dilatory and thus allowed
Sandusky to abuse two additional victims.  While surely such
remarks, assumed to be true for present purposes, must be
considered defamatory and damaging to a person's reputation,
such speech by itself does not violate any clearly established
constitutional right.  Paul, 424 U.S. at 702.  Fina and Noonan

-31-

only aver harm to their reputations. They do not allege any
threat to or loss of employment or any threat to or loss of
other tangible benefits. Fina was not serving under Kane in the
OAG at the time. Noonan was the State Police Commissioner,
appointed by the Governor, and served in that capacity from
January 18, 2011 until January 18, 2015 when the Governor left
office.

Feathers and Sheetz, however, plead that they lost
their jobs as a result of Kane's statements. Feathers avers
that "as a result of Kane's actions" that he "was compelled to
resign from his position as a member of the Pennsylvania State
Parole Board." Sheetz likewise avers that "as a result of
Kane's actions," he "was compelled to resign from his position
as an assistant district attorney at the Lancaster County
District Attorney's Office."

Under Pennsylvania law, the Board of Probation and
Parole (incorrectly denominated in the First Amended Complaint
as the State Parole Board) consists of nine members appointed by
the Governor and confirmed by the State Senate for six year
terms. 61 Pa. Const. Stat. § 6111. The members of the Board
such as Feathers are not under the control or authority of the
Attorney General.

The District Attorneys of Pennsylvania's sixty seven
counties are elected for four year terms. 53 Pa. Const. Stat.

§ 13152.  They are county rather than state officers under Article IX, § 4 of the Pennsylvania Constitution.  See Carter v. City of Philadelphia, 181 F.3d 339, 349 (3d Cir. 1999).  The Pennsylvania Attorney General cannot replace a District Attorney and generally "has no inherent authority to supersede a district attorney's decision generally."  Id. at 353.  While the Attorney General has limited powers to supersede with respect to a particular prosecution, the Attorney General has no control over the administration of a District Attorney's Office, such as supervision or training of assistant district attorneys.  Id. at 353-54.

Even if we assume that Kane influenced the Governor to obtain Feathers' resignation as a member of the Board of Probation and Parole and influenced the District Attorney of Lancaster County to compel the resignation of Sheetz as an assistant district attorney, we have found no case law that clearly establishes a constitutional right against a public official such as Kane for such conduct.  The McLaughlin and Zaloga decisions suggest the contrary.

In McLaughlin, Court of Appeals determined that the defendant United States Attorney, who was alleged to have influenced the plaintiffs' employer, the Pennsylvania Attorney General, to impose adverse employment conditions on the plaintiffs, had "no reason to believe that requesting or

-33-

influencing another's employer to take adverse personnel action violated first amendment [sic] rights[.]" 271 F.3d at 574. The Court provided that when a public official is sued for "allegedly causing a third party to take some type of adverse action against plaintiff's speech . . . [i]t is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take action." Id. at 573. Instead, the defendant "must 'threaten' or 'coerce' the third party to act." Id. There is no allegation and it is not plausible that Kane threatened or coerced the Governor or the District Attorney of Lancaster County, both independently elected officials.

Similarly in Zaloga, a case in which the defendant Borough council president was alleged to have pressured county officials to discontinue a contractual relationship with the plaintiff's company, the Court of Appeals determined that the defendant was entitled to qualified immunity. 841 F.3d 170. It highlighted that the Borough council president did not himself have the power to take adverse action against the plaintiff. Notably, the Court observed, "it has never been established that a government official who does not himself retaliate but instead pressures another to retaliate . . . can be held personally liable." Id.

Consequently, Kane is entitled to qualified immunity not only on the claims in Count Four brought by Fina and Noonan, who have only alleged harm to their reputation, but also on the claims brought by Feathers and Sheetz.

Fina, Sheetz, Feathers, and Noonan allege in Count Five that in a November 2014 interview Kane accused them of possessing and distributing child pornography and other controversial images using their OAG email accounts and in connection with their investigation of Sandusky, even though she knew these accusations were false. This interview took place several months after Kane had released certain of their emails. No threat, coercion, or intimidation has been alleged in connection with this count. See Mirabella, 853 F.3d at 651. Fina and Noonan do not plead any threat to or a loss of employment or any threat to or loss of any tangible benefit. Rather they only allege damage to their reputations. See Paul, 424 U.S. at 702.

As in Count Four, Feathers and Sheetz aver that they were forced to resign from their positions on the Pennsylvania Board of Probation and Parole and the Lancaster County District Attorney's Office, respectively. For the reasons discussed above, Kane is entitled to qualified immunity on Count Five with respect to Fina, Noonan, Feathers, and Sheetz.

Finally we turn to Count Six. Fina, Sheetz, Feathers, Noonan, and Costanzo allege that in September 2014 Kane selectively released their names and emails that contained pornographic images in retaliation for their criticism of her. They aver that she received two legal opinions prior to the release that instructed her that she was not permitted to release their names under Pennsylvania law.

The five plaintiffs appear to tie their claims in Count Six to the previously discussed threats made by the Chief Operating Officer of the OAG and the Chief Deputy Attorney General for Appeals and Legal Services of the OAG. These threats, made in the summer of 2014, promised "a lot of those people [former OAG staff] are going to be hurt if 'Fina does not back off,'" and "if Fina did not stop criticizing Kane, Kane would release the private emails of the former OAG staff." Kane released the emails thereafter in September 2014. Reading the First Amended Complaint as did the Court of Appeals, we interpret it as including all of the plaintiffs as "those people."

The Court of Appeals has deemed these threats to constitute more than defamation and would allow discovery to go forward on the merits, that is so that it can be determined "whether that retaliation would deter a person of ordinary firmness from exercising those rights[.]" Noonan, 698 F. App'x at 54.

Under these circumstances, Kane is not entitled to qualified
immunity on Count Six.

VI

In sum, the court will grant the motion of defendant
Kane to dismiss Counts One, Four, and Five on the ground that she
is entitled to qualified immunity.  The motion will otherwise be
denied.  The motion of defendant Miletto will be denied.  Discovery
may proceed on the merits as well as the issue of qualified
immunity on the remaining counts.