IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK NOONAN, et al.          :          CIVIL ACTION
                             :
        v.                   :
                             :
KATHLEEN KANE, et al.         :          NO. 15-6082

MEMORANDUM

Bartle, J.                                    December 1, 2020

　　　　　Plaintiffs Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr., E. Marc Costanzo, and Frank Fina bring this action under 42 U.S.C. § 1983 against Kathleen Kane, the former Attorney General of Pennsylvania, and Michael Miletto, a Special Agent with the Office of the Attorney General ("OAG"), in their individual capacities[1] for retaliation and conspiracy to retaliate against them in violation of their rights under the First Amendment to the United States Constitution.[2]  Before the Court is the motion of defendants for summary judgment on all remaining claims in this action.

---

[1].      Plaintiffs also sue defendants in their official capacity.  State government officials may not be held liable in their official capacity for damages that result from violations of the federal law.  See Hafer v. Melo, 502 U.S. 21 (1991).

[2].      Fina and Costanzo also brought First Amendment retaliation and conspiracy claims against Christopher Brennan, a reporter for the Philadelphia Daily News, as well as state law claims for defamation and false light against Brennan, the Philadelphia Media Network, LLC, and Philadelphia Media Network (Digital) LLC, which together own the Philadelphia Daily News (collectively, the "Media Defendants").  The Media Defendants have been dismissed from this action by agreement of the parties.

I

The Court dismissed all of plaintiffs' First Amendment retaliation and conspiracy claims for failure to state a claim on which relief could be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Noonan v. Kane, 195 F. Supp. 3d 737 (E.D. Pa. 2016).  We determined that the retaliatory speech alleged in the First Amended Complaint was insufficient to deter a person of ordinary firmness from exercising his First Amendment rights in the absence of an accompanying "threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow."  See Mirabella v. Villard, 853 F.3d 641, 651 (3d Cir. 2017); see also Noonan v. Kane, 698 F. App'x 49, 53 (3d Cir. 2017) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir. 2000).  The Court declined to exercise supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.

Our Court of Appeals reversed.  Noonan, 698 F. App'x 49. The Court identified three instances pleaded by plaintiffs "in which Defendants (or associates at their direction) threatened them" and held that plaintiffs "have alleged a colorable claim of retaliation in violation of their First Amendment rights."  It described the three threats as follows:

> Fina alleges that his colleague was told by
> Kane's deputy that 'if Fina did not stop

> criticizing Kane, [she] would release the
> private e-mails of the former [OAG] staff.'

> *     *     *

> Fina alleges that Kane's staff threatened that
> 'a lot of [Fina's] people are going to be hurt
> if 'Fina does not back off.'

> *     *     *

> Plaintiffs allege that Miletto physically
> threatened and intimidated them at the
> courthouse where they were about to testify
> against him regarding the grand jury leak,
> which lead to the court issuing a protective
> order against him.

The Court noted:

> No doubt facts found in discovery will make or
> break Plaintiffs' case. But at the motion-to-
> dismiss stage they have alleged a colorable
> claim of retaliation in violation of their
> First Amendment rights. Whether that
> retaliation would deter a person of ordinary
> firmness from exercising those rights is a
> question to be decided by the factfinder and
> not discarded so early.

Noonan, 698 F. App'x at 54.  The Court of Appeals remanded with

instruction to this Court to consider the issue of qualified

immunity.[3]  Thereafter, upon the motion of defendants to dismiss,

this Court determined that Kane was entitled to qualified immunity

on Counts I, IV, and V.  See Noonan v. Kane, 305 F. Supp. 3d 587

(E.D. Pa. 2018).  Defendants now move for summary judgment on the

_____

3.        This Court had not reached defendants' argument in
their motion to dismiss that they are entitled to qualified
immunity.

remaining counts of the First Amended Complaint.  Kane seeks summary judgment as to Counts II and VI.  Kane and Miletto seek summary judgment as to Count III.

II

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A factual dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is material if it might affect the outcome of the suit under governing law.  Id. at 248.

We view the facts and draw all inferences in favor of the non-moving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [the non-moving party]."  See Anderson, 477 U.S. at 252.  "The plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Id. at 257.

When briefing a motion for summary judgment and response, the parties must support each factual assertion or dispute with either a citation to the record or by showing that the materials cited do not establish the absence or the presence of a disputed fact.  Fed. R. Civ. P. 56(c)(1).  The Court is only required to consider materials cited by the parties in the summary judgment record.  Fed. R. Civ. P. 56(c)(3).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

The Court may consider materials in the summary judgment record not cited by the parties.  Fed. R. Civ. P. 56(c)(3).  However, this does not render judges "pigs, hunting for truffles buried in briefs."  United States v. Hoffecker, 530 F.3d 137, 162 (3d Cir. 2008) (internal quotations omitted).  A "skeletal argument" not more than an assertion does not operate to preserve a claim on summary judgment.  Id.

### III

The following facts are undisputed or viewed in the light most favorable to the plaintiffs, the non-moving party.  The Court notes at the outset that plaintiffs nearly doubled the 45-page limit permitted by the Court for each of the opposition

briefs.   Plaintiffs also regularly disregard the direction of the Court's scheduling orders that "every factual assertion set forth in any brief shall be supported by a citation to the record where that fact may be found."   Further, plaintiffs repeatedly rely on their extensive statements of fact without specifying exactly what facts in their statements support their often conclusory legal arguments.   The lengthy briefs of the plaintiffs are long on advocacy and often short on citations to specific evidence in this long and involved record.   We repeat what our Court of Appeals aptly stated in Hoffecker that judges are not like "pigs, hunting for truffles buried in briefs."   530 F.3d at 162.

The events at issue in this action stem from a series of acrimonious public disputes involving plaintiffs and defendant Kathleen Kane after she announced her candidacy for Pennsylvania Attorney General in 2011.   Plaintiffs were several law enforcement officers and prosecutors who were either employed by or working with the OAG at that time on the investigation and prosecution of Pennsylvania State University football coach Jerry Sandusky.   The investigation began in 2009 under Pennsylvania Attorney General Thomas Corbett and resulted in Sandusky's conviction in June 2012 on numerous counts of sexually abusing minors.

Frank Noonan, who had the Sandusky investigation under his supervision, was the OAG's Chief Supervisory Criminal

-6-

Investigator.  Corbett appointed Noonan Commissioner of the
Pennsylvania State Police after he was elected Governor of the
Commonwealth in November 2010.[4]  The investigation remained under
Noonan's purview as police commissioner.

Frank Fina was the Chief Deputy Attorney General who
spearheaded the Sandusky prosecution.  Richard Sheetz was the
Executive Deputy Attorney General of the OAG's Criminal Law
Division.  He supervised several Chief Deputy Attorneys General,
including Fina.  Sheetz monitored the Sandusky investigation in
this role but was not involved in its day-to-day activities.

Randy Feathers was Regional Director of the Bureau of
Narcotics Investigation and Drug Control in the OAG's State College
office.  He led the Sandusky investigation.  E. Marc Costanzo was a
Senior Deputy Attorney General in the Criminal Prosecutions section
of the OAG's Criminal Law Division.  Though not involved in the
Sandusky prosecution or investigation, he took on the role of
communicating with the press about the Sandusky case at the request
of Fina and Sheetz.

During Kane's campaign for Attorney General she publicly
criticized the length of the Sandusky investigation.  The briefs do

---

4.      Corbett resigned as Pennsylvania Attorney General
before he was inaugurated Governor of Pennsylvania in January
2011.  The Sandusky investigation continued under acting
Attorney General William Ryan for several months until Linda
Kelly took over as Attorney General to complete Corbett's term.

not discuss in any detail which if any of the plaintiffs she
specifically criticized.  Kane questioned whether Sandusky's
prosecution was delayed for political reasons related to Attorney
General Corbett's bid for Governor in 2010 and promised to
investigate the delay if elected Attorney General.  Kane won the
election and was sworn into office on January 15, 2013.   True to
her word, she brought an experienced Philadelphia prosecutor,
Geoffrey Moulton, Jr., into the OAG to review the Sandusky case.

Feathers retired from the OAG in 2012, a few months
before Kane's inauguration.  He made a national press appearance
shortly thereafter during which he defended the Sandusky
investigation and criticized Kane for politicizing it during her
campaign.  Governor Corbett appointed Feathers to the
Pennsylvania Board of Probation and Parole in 2012 after he left
the OAG.

Sheetz and Costanzo resigned a couple weeks before
Kane's inauguration.  Sheetz was unemployed for some time after
leaving the OAG but then started working part-time as an executive
assistant for the Lancaster County District Attorney.  Costanzo
started as a prosecutor with the Philadelphia District Attorney's
Office.  Fina continued at the OAG for a few days to assist with
Kane's transition.  He resigned on January 18, 2013 to join the
Philadelphia District Attorney's Office.

On January 17, 2013, the day before he left office, Fina presented some of the OAG's active investigations to Kane's incoming team.  During the presentation, Fina openly expressed that Kane had a conflict of interest with one of those investigations.

A lobbyist named Tyrone Ali was cooperating with the OAG to investigate several Pennsylvania legislators.  Ali had recorded legislators accepting illegal donations and bribes.  The name of Joshua Morrow, a political consultant, came up during the Ali investigation.  Investigators suspected Morrow of accepting straw donations for Dan McCaffery, a candidate for Philadelphia District Attorney in 2009.[5]  Kane had hired Morrow as a political consultant on her campaign for Attorney General and continued to work with him after the election.  McCaffery was the master of ceremonies at Kane's inauguration.  Kane was discussing with McCaffery the possibility of joining the OAG.

Fina was a supervising prosecutor on the Ali investigation.  He felt strongly that Kane's relationships with Morrow and McCaffery were conflicts of interest with the investigation.  Fina had attempted, albeit without success, to hand over the investigation after Kane was elected to the Federal Bureau of Investigation and the United States Attorneys Office.

---

5.      Morrow and McCaffery cooperated with investigators to return and identify the source of the donations.

Kane directed OAG Special Counsel Bruce Beemer to
conduct a review of the Ali investigation.  In doing so, Beemer
sought the assistance of Linda Dale Hoffa, Kane's new Senior
Executive Deputy Attorney General.  Beemer and Hoffa recommended
that Kane transfer the Ali investigation to another office for
prosecution, but she did not initially act on their recommendation.
In the months that followed, the OAG received repeated inquiries
about the investigation from the press.  According to Hoffa, Kane
believed Fina was leaking information.  There was concern that
Ali's identity would become public.

Kane learned in March 2014 that a news article about the
Ali investigation was imminent.  On March 14, 2014, the OAG issued
a pre-emptive public statement characterizing the Ali investigation
as not prosecutable and tainted by the racial targeting of black
legislators.  Beemer disagreed with both characterizations.[6]

The Philadelphia Inquirer published an article about the
Ali investigation on March 16, 2014.  The March 16 article
identified Ali and described a sting operation.  It also detailed
Kane's relationships with Morrow and McCaffery – the conflicts of
interest Fina presented to Kane's staff before leaving the OAG.  On

---

6.          Several legislators implicated in the Ali
investigation were ultimately prosecuted by the Philadelphia
District Attorney's Office.  Each of the legislators prosecuted
was convicted or pleaded guilty.

the day the article was published Kane agreed in an e-mail exchange
with OAG staff and an outside media consultant that the OAG should
contact the editors of The Philadelphia Inquirer and complain about
the article in order to ensure a balanced editorial.  She wrote, "I
will not allow them to discredit me or our office. . . . This is
war."  It appears that "them" included Fina.  The media consultant
advised her to "make war with Fina, NOT . . . the Inquirer."  Kane
held a press conference the next day during which she characterized
the Ali investigation again as not prosecutable, racially
motivated, and sloppy.  In response, Fina penned an editorial which
appeared in The Philadelphia Inquirer.  He challenged Kane to a
televised debate during which reports could question each of them
about the Ali investigation.

       On March 19, 2014, during Kane's battle with Fina in the
press, Special Agent Miletto contacted David Peifer about "the next
case that was going to hit the paper for non-prosecution."  Peifer
was a Special Agent that Miletto knew to be a member of Kane's
inner circle.  Miletto sought to have information relayed to Kane
about a 2009 investigation into the finances of J. Whyatt
Mondesire, the former President of the Philadelphia Chapter of the
NAACP.  Miletto believed that Fina and Costanzo improperly shut
down the investigation in 2009.

In 2009, the OAG conducted a grand jury investigation into a state funded job training program called Creative Urban Education Systems ("CUES").  Deputy Attorney General William Davis was assigned to the CUES investigation.  Davis learned that Mondesire, who was not originally the focus of the CUES investigation, may have been involved in siphoning CUES grant money.  Mondesire was the chairman of the CUES Board.  Davis asked Costanzo for guidance in 2009 on whether he could investigate Mondesire.  Costanzo advised Davis to run a request up the chain of command in light of Mondesire's public stature.[7]  On June 19, 2009, Davis sent a memo to Fina who supervised the CUES investigation. In the memo, Davis summarized for Fina various money transfers between CUES and another entity headed by Mondesire.  Davis requested approval to interview and subpoena Mondesire to testify before the CUES grand jury.

Special Agent Miletto worked with Davis on the CUES investigation and would have taken the lead on the investigation into Mondesire.  However, Davis's requests to interview and subpoena Mondesire were never approved.  Miletto became upset when he could not move forward.  He complained to Davis, accused Fina of not doing his job, and confronted Costanzo.  Fina and Costanzo

---

7.      Costanzo testified that he was not involved with the CUES investigation until Davis approached him about Mondesire.

subsequently had Miletto transferred out of the Criminal Prosecutions section of the OAG.  According to them, Miletto was difficult to work with and did not take direction well.

On March 21, 2014, Peifer met with Miletto at Kane's direction to record his account of the CUES-Mondesire investigation.  Miletto also gave Peifer a memo that Davis had written to Fina and Costanzo about the investigation.  Peifer gave a copy of the statement and memo to Kane.  On May 4, 2014, Kane arranged with Morrow for documents related to the CUES-Mondesire investigation to be handed over to <u>Philadelphia Daily News</u> reporter Christopher Brennan.  Morrow and Kane exchanged texts the following day:

> **Morrow:** What is the saying about revenge?
>
> **Kane:** Best served cold . . . Are we eating out soon?
>
> **Morrow:** Yes . . . I hope you enjoy the read in a few days. . . .
>
> **Kane:** I think I will. Can you give me a hint?
>
> **Morrow:** Best to be able to deny . . . But the daily news has 4 reporters on it . . . time for frank to feel the hear[sic] . . .

Brennan contacted Fina, Costanzo, and Davis separately in the days that followed.  He sought comment on an OAG

investigation into Mondesire.  Brennan referenced language from a
memo written by Davis.[8]

On June 6, 2014, the <u>Philadelphia Daily News</u> ran an
article authored by Brennan about a probe into Mondesire's
finances.  In the June 6 article, Brennan identified "[a] 2009 memo
written by then-Deputy Attorney General William Davis Jr." to
"then-Chief Deputy Attorney General Frank Fina and then-Senior
Deputy Attorney General E. Marc Costanzo."  Brennan detailed
several of the money transfers identified by Davis in his June 19,
2009 memo to Fina.  Brennan stressed that no one from the OAG's
office ever interviewed Mondesire.

It is undisputed that Kane leaked confidential material
from the CUES-Mondesire grand jury investigation to assist Brennan
with the June 6 <u>Philadelphia Daily News</u> article.  There is no
dispute that this was in response to the March 16 <u>Philadelphia
Inquirer</u> article on the Ali investigation.  It is also conceded
that Kane leaked the CUES-Mondesire material in order to undercut
the credibility of Fina and Costanzo and that information Kane
released was false and defamatory.  Contrary to Kane's false
accusations, Fina and Costanzo did not actually terminate a
promising investigation into Mondesire.  Plaintiffs do not

---

8.      Whether Davis's June 19, 2009 memo, the memo Miletto
gave Peifer, and the memo Kane leaked to Brennan are one and the
same is not addressed by the parties in their briefs.

reference in the record the specifics of the accusations made by Kane.

When Beemer learned of the June 6 article, he "was certain there was a leak," but Kane appeared to be unconcerned. Kane promoted Beemer to First Deputy Attorney General in mid-June 2014.  Around this time, Beemer received a phone call from Montgomery County Court of Common Pleas Judge William R. Carpenter, who was supervising the Statewide Investigating Grand Jury.  Fina and Costanzo had met with Judge Carpenter after Philadelphia Daily News reporter Brennan contacted them for comment about the Mondesire investigation.  They informed Judge Carpenter that they suspected Brennan was in possession of confidential material from the investigation.  As a result, Judge Carpenter appointed a special prosecutor, Thomas Carluccio, to investigate a possible leak and told Beemer he expected the full cooperation of the OAG.

Meanwhile, Moulton was preparing a report on his review of the Sandusky investigation.  He had learned in early 2013 that the OAG's e-mail correspondence from the time of the Sandusky investigation had been deleted in accordance with an e-mail retention policy implemented under former acting Attorney General William Ryan.  Ryan held office for a time after Corbett resigned as Attorney General and before Kane was sworn in.  Moulton worked

with OAG Special Agent Braden Marshall Cook for over a year to recover the e-mails.

Cook was finally able to begin reviewing the OAG's e-mail correspondence from the Sandusky case in March 2014.  During an initial review, Cook found several pornographic or otherwise inappropriate e-mails which OAG employees assigned to the Sandusky investigation had received and exchanged.  Cook told Special Agent Peifer, his direct supervisor, of what he had found.  Around the same time, Kane's head of security and bodyguard, Patrick Reese, asked Cook to give him access to the database where the Sandusky e-mails were stored.  Cook refused.  Reese was nonetheless given access to the Sandusky e-mails as early as April 4, 2014.  He began searching for e-mails which Fina received or sent that contained the term "porn."

The discovery of the pornographic e-mails quickly became known outside the OAG.  Former Chief Deputy Attorney General Glenn Parno encountered then-OAG Chief Deputy Attorney General of Appeals James Barker in Strawberry Square[9] in February or March 2014.  Parno had left the OAG's office that January.  During the encounter, Barker volunteered to Parno that "they found the

---

9.       Strawberry Square is an office complex in Harrisburg Pennsylvania which houses the OAG's headquarters and numerous other offices, a food court, and several retail establishments.

porn."[10]   Parno was a friend of Fina.   Like Fina, Barker and Parno would later be identified in requests submitted by newspaper reporters for pornographic e-mails exchanged by OAG employees. Additionally, Fina received a phone call about the e-mails at some point in April 2014.   The call was from former Wayne County District Attorney Mark Zimmer.   According to Fina, Zimmer told him the OAG "has these [pornographic] e-mails and they are threatening the Corbett Administration, and you're on them too."[11]

On June 23, 2014, the OAG released a report summarizing Moulton's review of the Sandusky investigation.   Moulton's report did not mention the pornographic e-mails.   Kane stated during an OAG press conference held the day the report was released that the delay in the Sandusky investigation permitted Sandusky to sexually abuse children two more times.   At least two newspaper articles reported Kane's assertions as well as statements made by plaintiffs in response.   Kane's assertions turned out to be false.

The day the Moulton report was released to the public the Times Leader in Wilkes-Barre ran an article stating that "lead investigators in the Jerry Sandusky case took strong exception to the report."   The OAG had provided plaintiffs with the Moulton

---

10.      As detailed below, the pornographic e-mails of both Parno and Barker would later be subject to public information requests by the press.

11.      Zimmer has not testified in this action.

report and an opportunity to respond before it was released.  In a
response attached to the report upon its release, plaintiffs
contended the report contained "errors of fact and unsupported
assertions and conclusions."  The Times Leader quoted or referenced
statements made by Noonan, Fina, Sheetz, and Feathers.  The New
York Times quoted Fina and Feathers describing Kane's assertion
that Sandusky abused children two more times due to the delay as an
"outright fabrication."  According to Fina, "[t]here was nobody who
came forward who we found had been assaulted during this
investigation."

The Thirty-Fifth Statewide Investigating Grand Jury,
which Judge Carpenter was supervising, was empaneled to investigate
the leak of confidential grand jury materials from the
CUES-Mondesire investigation.  Sometime in July 2014, Special
Prosecutor Carluccio subpoenaed Fina and Costanzo to testify before
the grand jury on August 26, 2014.

On July 7, 2014, the OAG received a request for records
under the Pennsylvania Right-to-Know Law ("RTKL"), 65 P.S.
§§ 67.101, et seq.  The request came from Pittsburgh Tribune-Review
reporter Brad Bumsted.  He sought "E-mails and/or E-mail
attachments reviewed by Special Deputy Geoffrey Moulton that
contain pornographic images" that were "sent by former and current

AG staff to other current and former AG staffers."  This was the
first of several RTKL requests of this kind submitted to the OAG.

On July 29, 2014, the OAG received an RTKL request from
Steve Esack, a reporter for The Morning Call in Allentown.  Esack
was first to request the e-mails of specific individuals.  He
sought the pornographic e-mails of "Frank Fina, Frank Noonan, Glenn
Parno, E. Christopher Abruzzo, Christopher Carusone, Joseph
McGettigan, Randy Feathers, and Tom Corbett."

On August 11, 2014, Brennan of the Philadelphia Daily
News sent an RTKL request for the pornographic e-mails of Fina
"and/or his former colleagues."  Staff writer Craig McCoy, with The
Philadelphia Inquirer, made an RTKL request on August 22, 2014 in
which he sought the "pornographic or otherwise inappropriate"
e-mails of "Frank Fina, Patrick Blessington, Marc Costanzo, Chris
Abruzzo, Chris Carusone, Kevin Harley, Frank Noonan, James Barker,
Bruce Beemer, Louis De Titto and Ellen Granahan from 2005 until the
present."

Beemer became concerned when the OAG received RTKL
requests for the e-mails of specific individuals.  The OAG engaged
outside Post & Schell attorney Sara Yerger, Esq. to review the RTKL
requests.

Newspaper reporters Bumsted and McCoy contacted Fina
after they sent RTKL requests to the OAG.  According to Fina,

Bumsted, the reporter with the Pittsburgh Tribune-Review, called
and texted him on August 13, 2014 to warn that members of the OAG's
press team were telling people in the media to send requests for
the pornographic e-mails of Fina and others.  Bumsted thought Fina
was being set up.  McCoy, a staff writer with The Philadelphia
Inquirer, called Fina a week later to share that "press people from
the A.G.'s Office are circulating in the Capitol and the Capitol
press room" and instructing the press to make RTKL requests for
Fina and his "circle."  Fina also received a call from Dennis
Rodney, a career journalist and former Corbett spokesperson.
Rodney advised Fina that he had received "calls, the Kane people
are planting this and telling people to file these Right-to-
Knows."[12]

Parno testified that he encountered OAG Chief Deputy
Attorney General of Appeals James Barker a second time in
Strawberry Square in Harrisburg in August 2014.  By this time Parno
had also been contacted by a newspaper reporter about the e-mails.
He stopped Barker and asked him what was happening with the
e-mails.  According to Parno, Barker advised him that Kane was
going to release the e-mails because of "her battles with Fina
[who] keeps making her look bad in the press."  Parno further

---

12.     Bumsted, McCoy, and Rodney have not testified in this
action.

recounted that Barker told him to tell "[Fina] to stop running to the press." Parno responded that he had not spoken with Fina in a long time and did not have a way to contact him. Parno also ran into David Tyler in August 2014. Tyler was the OAG Chief Deputy Attorney General of Operations under Kane. Like Barker, Tyler informed Parno that Kane was going to release the e-mails because of her battles with Fina. There is no evidence that Parno ever spoke to Fina about his conversations with Barker and Tyler.

Tyler had an encounter in Strawberry Square in August 2014 with another friend of Fina Christopher Carusone. Carusone had left the OAG in 2011 to join the staff of Governor Corbett. He testified that Tyler told him that the RTKL requests may have come from Kane's campaign, that he, Tyler, was trying to talk Kane out of releasing the e-mails, but that "every time [he gets] her calmed down . . . Fina riles her up again." As the conversation continued, Tyler asked Carusone to "talk to [Fina] . . . to get him to agree to some kind of a truce" and added "[p]eople are going to get hurt." Carusone understood that if Fina stopped publicly criticizing Kane the e-mails would not be released. He immediately called Fina. Carusone was also identified by newspaper reporters in the RTKL requests.

According to Costanzo, Fina told Special Prosecutor Carluccio about a threat that his personal e-mails would be made

public as a result of their "continued cooperation" with the
investigation into the CUES-Mondesire leak.  Carluccio relayed
Fina's concern to Judge Carpenter who held an in camera ex parte
hearing on August 25, 2014.  At the hearing Fina told Judge
Carpenter about the conversations with Bumsted and McCoy as well
about Carusone's interaction with Tyler.

The statewide grand jury courtroom is located on the
same floor and in the same building in Norristown, Pennsylvania as
the OAG's regional office.  Fina and Costanzo arrived about 30
minutes early on August 26, 2014 to testify, pursuant to subpoena,
before the Thirty-Fifth Statewide Investigating Grand Jury.  Upon
arrival, they saw Special Agent Miletto standing in the lobby of
the building with OAG Special Agents Michael McIlmail and John
Gregory, as well as with David Shallcross, who was not affiliated
with the OAG.

Costanzo had a contentious relationship with McIlmail.
Gregory was a friend of McIlmail's.  As noted above, Miletto had
worked with Davis who sought Fina's and Costanzo's help to move
forward with the CUES-Mondesire investigation.  Miletto blamed Fina
and Costanzo for not being permitted to investigate Mondesire.
Fina and Costanzo also had Miletto transferred out of the OAG's
Criminal Prosecutions section.  Neither Costanzo nor Fina knew
Shallcross.

Fina and Costanzo initially waited in their car when they saw Miletto and the three other men in the lobby.  Because these men did not leave, Fina and Costanzo walked into the lobby and directly to the elevator.  The four men followed behind them. According to Fina, the four men appeared to be trying to start an altercation.  Fina and Costanzo separately characterized the atmosphere as very tense.  Fina described that as they waited for the elevator Miletto was "looming, like he's up on me."  At this point, Fina turned to Miletto and asked, "What's up, Mike?" Costanzo testified:

> [T]his was a Miletto routine . . . he would do this all the time. . . . He thought that if he would make a maniacal look and huff and puff and say things under his breath -- and he did that to me and others on numerous occasions throughout the months when we had problems there.  They are documented in writing, in e-mails to the point where there were almost fist fights with attorneys like Mr. Davis, uhm, that had to be quickly avoided. I mean, he thought somehow it was, you know, he thought somehow this snorting, maniacal, wide-eyed look was going to, like, intimidate people, uh, and he would use it all the time. And so he got that look on his face, and he said, "I don't know, Frank. You tell me. The sky? The moon? The star[s]? That's what's up."

The elevator arrived and all six men entered.  Fina and Costanzo stepped into the elevator first, and the four others

"crowded on behind" them.[13]  Fina stated that while on the elevator, Miletto stood nose-to-nose with him.  Fina and Costanzo heard someone talking, trying to settle down the tension.  Very quickly thereafter, the elevator arrived on the third floor where both the grand jury suite and the OAG's office were located.  All six occupants exited.  Fina and Costanzo entered the grand jury suite where they immediately found Special Prosecutor Carluccio and explained what had happened.  The plaintiffs do not cite any evidence in the record of any contact between Miletto and Fina and Costanzo after the brief ride on the elevator.

The briefs reference no evidence that Kane and Miletto had any contact related to the leak of material from the CUES-Mondesire investigation, Fina's and Costanzo's cooperation with the grand jury investigating the leak, or Miletto's encounter with them in the building in Norristown on August 26, 2014.  To the contrary, Miletto, a Special Agent with the OAG, testified that the only interaction he ever had with Kane occurred during a meeting at which she congratulated him and several other agents for doing a good job on an unrelated investigation and in passing when she visited the OAG regional office where he worked.  Plaintiffs cite

---

13.    Miletto testified that Fina and Costanzo entered the elevator after he, McIlmail, Gregory, and Shallcross entered.

nothing in the record to dispute nor do they address Miletto's testimony.

On August 27, 2014, based on what was said at the in camera ex parte hearing on August 25, 2014, the day before the elevator incident, Judge Carpenter issued a protective order pursuant to 18 Pa.C.S. § 4954[14] which stated in relevant part:

1. The Office of the Attorney General, except upon specific authorization by this Court or the Special Prosecutor, shall refrain from any involvement in, or access to, the investigative efforts of the Special Prosecutor.

2. Employees of the Office of the Attorney General shall refrain from engaging in, or soliciting, any act of obstruction, intimidation or retaliation against any witness summoned by the Grand Jury in the Special Prosecutor's investigation.

The OAG filed a motion for reconsideration of the entire protective order in which it argued the order adversely impacted its operation.  On September 17, 2014, Judge Carpenter ordered an in camera hearing on the motion for reconsideration to be held on October 17, 2014.

---

14.      "Any court with jurisdiction over any criminal matter may, after a hearing and in its discretion, upon substantial evidence, which may include hearsay or the declaration of the prosecutor that a witness or victim has been intimidated or is reasonably likely to be intimidated, issue protective orders..." (emphasis added).

Yerger, as noted above, had been engaged by the OAG to review the RTKL requests from the reporters.  In late September 2014, before the hearing on the OAG's motion for reconsideration, Yerger sent letters to the reporters denying the RTKL requests. Bumsted published an article in the <u>Pittsburgh Tribune-Review</u> on September 23, 2014 which reported the denial of his request.  That day, Kane e-mailed the article to media consultant Charlie Holleran.  She wrote, "We have to do something. I have an idea." In the following days, Kane voiced among senior OAG staff her desire to release the e-mails despite Yerger's recommendation and her letters denying the RTKL requests.

Kane thereafter authorized the release of certain e-mails to the press.  A press conference was held on September 25, 2014 at which OAG Special Agent Cook selectively displayed the e-mails to the press.  As far as the Court is aware, there are no copies in the record of the e-mails Cook displayed at the press conference.  There is no evidence cited that Kane was present.

Before the press conference, Renee Martin, the OAG Director of Communications, and Special Agent Cook used black sharpies to redact the names and e-mail addresses of several dozen individual senders and recipients.[15]  Kane testified that the

_____

15.      Martin testified that it was Cook who instructed which names to leave visible.  Cook testified Martin was in charge of the redactions.

-26-

decision to redact certain individuals' names was based on whether they were current OAG employees or union members and whether by releasing their names the OAG would run afoul of Judge Carpenter's protective order.  Only eight names remained visible to the press. Among them were plaintiffs Noonan, Feathers, and Sheetz.  Fina and Costanzo were not mentioned, and Kane did not release their e-mails at the press conference or anytime thereafter.  Noonan concedes he received "inappropriate" or "offensive" e-mails.  Feathers and Sheetz concede they received and also forwarded "inappropriate" or "offensive" e-mails.  Defendants characterize the e-mails as "pornographic."  The e-mails in the record before this Court establish without a reasonable doubt that defendants are correct as to some of the e-mails.

On October 17, 2014, Judge Carpenter held the in camera hearing on the motion of the OAG for reconsideration of the protective order.  The OAG requested that Fina and Costanzo be subpoenaed and Carluccio be called to testify at the hearing.  The OAG also requested a transcript of the August 25, 2014 in camera ex parte hearing.  Judge Carpenter denied the requests.  Kane's Chief Deputy Attorney General of Appeals, James Barker, presented evidence at the hearing of the pornographic e-mails recovered during Moulton's review of the Sandusky investigation.  The OAG did

not present any witness to substantiate its claim that the protective order impacted its operations.

Judge Carpenter held a second hearing on October 17, 2014 immediately after the hearing on the OAG's motion for reconsideration.  The second hearing was held in camera and ex parte.  Barker testified at this hearing that the OAG began to receive general RTKL requests for pornographic e-mails sent or received by OAG staff on July 7, 2014 and that the requests were amended toward the end of August 2014 to add specific names, including Fina, Costanzo, and Carusone.

On October 30, 2014, Judge Carpenter entered an order denying the OAG's motion for reconsideration.  He held that the OAG failed to show cause why the protective order should be vacated. He found that the order was necessary and appropriate to deter grand jury witness intimidation and retaliation.

On November 13, 2014, Kane, through her private attorney, filed an Emergency Application for Extraordinary Relief in the Supreme Court of Pennsylvania pursuant to 42 Pa.C.S. § 726 and the King's Bench power.[16]  Kane sought to quash the submission

---

16.      Both 42 Pa.C.S. § 726 and Section 1 of the Schedule to Judiciary Article to the Constitution of the Commonwealth of Pennsylvania (commonly referred to as the "King's Bench" power) permit the Supreme Court of Pennsylvania to exercise plenary jurisdiction over matters of immediate public importance.  See also Pa. R.A.P. 3309.

that initiated the Thirty-Fifth Statewide Investigative Grand Jury and to vacate Judge Carpenter's protective order.  She argued that Fina and Costanzo had manufactured the grand jury investigation into the CUES-Mondesire leak.  Kane contended they did this in order to hedge against her release of pornographic e-mails they viewed and distributed on OAG computers.  She filed under seal with her emergency application a 398-page collection of 20 e-mail chains with attachments sent and/or received by plaintiffs and others while at the OAG.  Kane characterized the e-mails as "pornographic, misogynistic, racist, obscene and offensive."

The Supreme Court of Pennsylvania entered an order per curium on December 4, 2014 in which it directed Judge Carpenter to respond to certain issues raised in Kane's emergency petition. Thereafter, Judge Carpenter filed with the Supreme Court an opinion in support of the protective order.  See <u>Pennsylvania Office of Attorney Gen. v. Supervising Judge of the 35th Statewide Grand Jury</u>, Action No. 171-MM-2014 (Pa. Dec. 12, 2014).  Judge Carpenter recounted:

> [T]here were attempts, direct and indirect, by agents of the OAG to sway Mr. Fina's and Mr. Costanza's testimony before the Grand Jury. It was the substance of the threats combined with the timing of those threats, i.e., when the OAG became aware that both men were subpoenaed to testify, that created an atmosphere of intimidation.

Id. at 11.  At no time did Judge Carpenter hear testimony from
either Kane or Miletto.

About the plaintiffs' pornographic e-mails, Judge
Carpenter wrote:

> It seems that the problem surrounding the
> public discussion has occurred because
> Attorney General Kane has cherry picked which
> and whose e-mail to selectively release. It
> all should be released, without which a proper
> discourse cannot occur.

Id. at 12.

On December 14, 2014, the Thirty-Fifth Statewide
Investigating Grand Jury concluded its investigation into the
CUES-Mondesire leak and ultimately recommended that the District
Attorney of Montgomery County charge Kane with: (1) perjury in
violation of 18 Pa.C.S. § 4902; (2) false swearing in an official
proceeding in violation of 18 Pa.C.S. § 4903; (3) obstructing the
administration of law or other governmental functions in violation
of 18 Pa.C.S. § 5101; (4) official oppression in violation of 18
Pa.C.S. § 5301; and (5) contempt of court in violation of 42
Pa.C.S. § 4549.

On August 26, 2015, the Supreme Court of Pennsylvania,
at the request of Judge Carpenter, unsealed the records of the
Thirty-Fifth Statewide Investigating Grand Jury that had been made

a part of the record before it.[17]  Among the materials unsealed by
the Supreme Court was the 398-page collection of 20 e-mail chains
with attachments Kane submitted with her emergency application.
Those unredacted e-mails and attachments were released and made
available to the public.  They are in the summary judgment record
before this Court.  It is undisputed each of the plaintiffs was a
recipient of several of the 20 pornographic e-mails.  Fina sent six
of these e-mails and was a recipient of all except one.

On August 6, 2015, the Montgomery County District
Attorney, following a separate investigation, filed a criminal
complaint which charged Kane with all the above offenses except
contempt of court.  The Montgomery County District Attorney also
charged Kane with conspiracy to commit official oppression in
violation of 18 Pa.C.S. §§ 903 and 5301.

---

17.      The unsealing order provided:

      **AND NOW**, this 26th day of August, 2015,
upon the request of the supervising judge
for removal of the seal from all matters
involving the 35th Statewide Investigating
Grand Jury and the investigation of Attorney
General Kathleen Kane which have been lodged
in this Court, save for grand jury materials
such as testimony, exhibits, and in camera
proceedings, and based on the supervising
judge's assurance that there are no present
grand jury secrecy concerns relative to such
unsealing, it is hereby **ORDERED** that the
seal is lifted upon such terms.

In December 2015, several months after the Supreme Court of Pennsylvania released the pornographic e-mails, Kane, who was still serving as Attorney General, appointed Douglas F. Gansler to "conduct an independent investigation of allegedly sexually explicit, inappropriate or otherwise illegal e-mails" exchanged by employees on OAG e-mail servers.

On August 15, 2016, Kane was found guilty by a jury of every offense with which she was charged.  While she was found guilty of illegally releasing the CUES-Mondesire grand jury material, plaintiffs cite no evidence that an essential element of any of her crimes was her antipathy toward or retaliation against Fina and Costanzo or any other plaintiff.  Her crimes were not predicated upon any false statements by her that Fina and Costanzo shut down a promising investigation of Mondesire.  In addition, none of the offenses related to the release or threatened release of any pornographic or offensive e-mails.

Kane resigned as Attorney General of Pennsylvania effective August 17, 2016.  The following day the OAG released a report by Gansler summarizing his investigation into the pornographic e-mails.  After an extensive review, Gansler identified 11,930 "inappropriate e-mails" sent by more than 370 OAG prosecutors or other personnel as well as by 25 Pennsylvania judges or judicial employees.  Gansler found obscene material or nudity in

or attached to approximately 25% of the e-mails.  The remaining 75% of the e-mails contained "other offensive material such as racism or sexism."  Feathers, Sheetz, and Fina concede that they received and forwarded "inappropriate" or "offensive" e-mails.  Similarly, Noonan and Costanzo concede that they received "inappropriate" or "offensive" e-mails.  As noted above, there can be no doubt that some of the e-mails were pornographic.

IV

Section 1983, under which plaintiffs sue, does not create a substantive right in and of itself.  Rather, it provides a remedy for the violation of an underlying constitutional right.  <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996).  The statute provides:

> Every <u>person</u> who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . <u>subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law</u>, suit in equity, or other proper proceeding for redress, . . .

42 U.S.C. § 1983 (emphasis added).  To succeed on a claim under § 1983, a plaintiff "must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law."  <u>Kneipp</u>, 95 F.3d at 1204 (internal quotations omitted).

Unlike the general tort law, § 1983 does not allow government officials to be held liable for constitutional injuries inflicted by their employees or agents unless the officials caused their subordinates to do so.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-92 (1978).  That is, government officials may not be held liable under § 1983 on a theory of respondeat superior.  Id.  As the Supreme Court explained in Monell, § 1983:

> [I]mposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights. At the same time, that language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor. Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent.

Monell, 436 U.S. at 692 (emphasis added).  Thus Kane, as the Pennsylvania Attorney General, cannot be held liable to plaintiffs under § 1983 for constitutional injuries inflicted by employees of the OAG unless she caused them to commit plaintiffs' injuries.

It is well-established that "an individual has a viable [§ 1983] claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. v.

-34-

Doyle, 429 U.S. 274 (1977)).  To prevail on a claim for First
Amendment retaliation under § 1983, a plaintiff must prove "(1)
that [the plaintiff] engaged in a protected activity, (2) that
defendants' retaliatory action was sufficient to deter a person of
ordinary firmness from exercising his or her rights, and (3) that
there was a causal connection between the protected activity and
the retaliatory action."  Lauren W. ex rel. Jean W. v. DeFlaminis,
480 F.3d 259, 267 (3d Cir. 2007); see also Thomas v. Indep. Twp.,
463 F.3d 285, 296 (3d Cir. 2006).

In reviewing claims for First Amendment retaliation, we
must focus "'on the status of the speaker, the status of the
retaliator, the relationship between the speaker and the
retaliator, and the nature of the retaliatory acts.'"  Brennan
v. Norton, 350 F.3d 399, 419 (3d Cir. 2000) (emphasis original)
(quoting Suarez, 202 F.3d at 686); see also Koren v. Noonan, 586
F. App'x 885, 888 (3d Cir. 2014).  Whether conduct is sufficient
to deter a person of ordinary firmness from exercising their First
Amendment rights "is a fact intensive inquiry." Id.  Nonetheless,
it is the plaintiff who has the burden to show that a defendant's
conduct meets this threshold.  See Revell v. City of Jersey City,
394 F. App'x 903, 906 (3d Cir. 2010).

Kane was acting under the color of state law as the
Pennsylvania Attorney General at the time the conduct at issue in

this action occurred.  Her antagonists were former high-level
prosecutors or investigators in the OAG under Attorney General
Corbett.  "'[W]hen a public official's allegedly retaliatory acts
are in the form of speech, the official's own First Amendment
speech rights are implicated.'"  Noonan, 698 F. App'x at 53
(quoting Zaloga v. Borough of Moosic, 841 F.3d 170, 176 (3d Cir.
2016)).  The retaliatory speech of a public official by itself
cannot be violative of a private citizen's First Amendment
rights even where it is defamatory.  See Paul v. Davis, 424 U.S.
693 (1976); Noonan, 698 F. App'x at 53 (quoting Suarez, 202 F.3d
at 687); see also Koren, 586 F. App'x at 888.  Where a public
official's alleged retaliation is in the nature of speech, there
can be no liability under § 1983 unless there was "a threat,
coercion, or intimidation, intimating that punishment, sanction,
or adverse regulatory action will follow."  Mirabella, 853 F.3d
at 651 (internal quotations omitted); see also Noonan, 698 F.
App'x at 53 (quoting Suarez, 202 F.3d at 687).  Defendants argue
that this standard has not been met as a matter of law.

V

Plaintiffs Fina and Costanzo allege in Count II and all
plaintiffs allege in Count VI of the First Amended Complaint that
Kane retaliated against them by releasing confidential material
from the 2009 CUES-Mondesire grand jury investigation, by making

false accusations against them related to the investigation, and by
releasing or threatening to release the pornographic e-mails they
sent and/or received on OAG computers.  Kane moves for summary
judgment on Counts II and VI on the ground that her own First
Amendment rights are implicated and there is no evidence connecting
Kane to any "threat, coercion, or intimidation, intimating that
punishment, sanction, or adverse regulatory action will follow."
Mirabella, 853 F.3d at 651; see also Noonan, 698 F. App'x at 53
(quoting Suarez, 202 F.3d at 687).

Plaintiffs first rely on the analysis in Suarez to
argue that liability may be established without showing threat,
coercion, or intimidation where a public official releases
pornographic e-mails, as Kane did here as to Noonan, Sheetz, and
Feathers, because Kane's conduct was sufficiently embarrassing,
humiliating, or emotionally distressful to deter a person of
ordinary firmness from exercising his or her constitutional
rights.  See Suarez, 202 F.3d at 688.  In Suarez, the Fourth
Circuit explained:

> One possible exception to this rule [that
> threat, coercion, or intimidation accompany
> retaliatory speech] is where the retaliatory
> disclosure of information relates to those
> personal rights that can be deemed
> fundamental or implicit in the concept of
> ordered liberty; that is, the resulting
> injury caused by the disclosure of the
> information in retaliation for engaging in
> protected conduct is sufficiently

> embarrassing, humiliating, or emotionally
> distressful.

Id. (emphasis added) (citing Bloch v. Ribar, 156 F.3d 673, 681 (6th Cir. 1998); Mattox v. City of Forest Park, 183 F.3d 515, 521 n. 3 (6th Cir. 1999)).  Plaintiffs do not cite to any decision showing that this specific reasoning in Suarez has been adopted by our Court of Appeals.  However, in addressing First Amendment retaliation claims, the Third Circuit has repeatedly cited Suarez with approval.  See, e.g., Brennan, 350 F.3d at 419; Koren, 586 F. App'x at 888; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006); McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001).

In Bloch, supra, cited by Suarez, a husband and wife, Thomas and Cynthia Bloch, brought a First Amendment retaliation claim under § 1983 against a county sheriff.  The sheriff was investigating the rape of Cynthia Bloch by an unknown assailant. Plaintiffs gave interviews to two local newspapers in which they criticized the sheriff for an 18-month delay in the investigation.  The newspapers subsequently ran articles reporting the criticism.  Plaintiffs pleaded that in retaliation for the articles the sheriff released to the press confidential and humiliating details of the rape.  The Bloch court held that though the sheriff had a First Amendment right to respond to criticism, the "right to respond to [plaintiffs'] criticism is

not unlimited, and . . . the Blochs have properly alleged that [defendant's] adverse action caused them to suffer an injury that would chill people of ordinary firmness from continuing to engage in their constitutionally protected activity." Bloch, 156 F.3d at 681.

The District of Delaware has decided a similar case. See Neuberger v. Gordon, 567 F. Supp. 2d 622 (D. Del. 2008).  In Neuberger, attorney Thomas Neuberger brought a First Amendment retaliation claim against a county and county officials.  He had previously filed several civil lawsuits against the defendants on behalf of clients alleging government corruption. Thereafter, defendants learned that Neuberger had been diagnosed with a brain tumor.  Neuberger sued alleging that upon learning of his condition defendants disclosed to the media that he was dying of a brain tumor which was causing him to act erratically. Defendants moved to dismiss on the ground that plaintiff pleaded "no real immediate threat of injury" and therefore lacked constitutional standing.  The court denied the motion because Neuberger, in addition to asserting damage to his professional reputation, pleaded that the defendants released his private medical information in order to spread the rumor that he was behaving erratically and would soon die.  Neuberger, 567 F. Supp. 2d at 637.

Contrary to Bloch and Neuberger, this case does not
involve intimate details about a rape suffered or personal
information about one's physical or mental health.  Here,
plaintiffs, who were prosecutors or law enforcement officers,
received or forwarded pornographic e-mails on government time
using government computers.  It turns out the receipt and
exchange of such e-mails on government computers was rampant
according to the undisputed Gansler report.  Such e-mails, which
involved numerous government employees including prosecutors and
state court judges, totaled in the thousands.  The public
certainly had a legitimate interest in knowing if plaintiffs as
public servants were fully engaged in doing the public's
business for their paychecks.  Indeed, the Supreme Court of
Pennsylvania released pornographic e-mails of the plaintiffs
that had been submitted to it for review.  Plaintiffs' interest
in keeping the e-mails private is not a "personal right[] that
can be deemed fundamental or implicit in the concept of ordered
liberty," see Suarez, 202 F.3d at 688, and is in sharp contrast
to the privacy interests at the core of the decisions in Bloch
and Neuberger.

Plaintiffs further argue that the retaliatory conduct of
Kane in releasing or threatening to release their pornographic
e-mails was actionable under § 1983 as speech constituting a

"threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow."  Mirabella, 853 F.3d at 651; see also Noonan, 698 F. App'x at 53 (quoting Suarez, 202 F.3d at 687).  As noted previously, there is no evidence that Kane ever released any of the e-mails of Fina or Costanzo.

Plaintiffs' case fails here for a number of reasons. First, there is no evidence that Kane threatened or acted in any way to intimate that the plaintiffs would lose their jobs at the OAG since at all times relevant they were no longer employed there.  Nor does the record show that Kane's actions intimated loss to plaintiffs of jobs elsewhere, of any government contracts, or of other benefits or intimated sanctions of any civil or criminal penalties or adverse regulatory actions. See Zaloga, 841 F.3d 170; Mirabella, 853 F.3d 641.  Kane never provided negative job references or urged any third parties to sanction, punish, or take an adverse action against plaintiffs. Conard v. Pa. State Police, 902 F.3d 178 (3d Cir. 2018); McLaughlin, 271 F.3d at 573-74.

Undoubtably, there was acrimony between Kane and all the plaintiffs.  She released false and defamatory information about Fina and Costanzo related to the CUES-Mondesire investigation.  With respect to the e-mails, Kane did not

-41-

fabricate any of the them or falsely accuse the plaintiffs of
receiving or forwarding them.  Even assuming that the false
accusations about the CUES-Mondesire investigation and the
release or threatened release of the e-mails were harmful to
plaintiffs' reputations and were defamatory, the Supreme Court
has held that defamatory statements or publications in and of
themselves are insufficient to establish a viable claim for
retaliation under § 1983.  Paul, 424 U.S. 693.  As our Court of
Appeals stated in Koren, a plaintiff must plead more than mere
"criticism, false accusations, or verbal reprimands," and "in
the political arena, courts have consistently rejected First
Amendment retaliation claims based upon assertions of
purportedly false reports or criticisms."  586 F. App'x at 888.
At most, this is what happened here.

        The Court rejects plaintiffs' argument that the events
in issue were not in the political arena.  Kane, a Democrat, was
elected Attorney General of Pennsylvania.  She considered
plaintiffs to be political adversaries who had held high
positions in the OAG when Thomas Corbett, a Republican, was the
Attorney General.  Her criticism of the investigation of
Sandusky during Corbett's tenure played a major role in her
campaign.  The plaintiffs were deeply involved in that
investigation.  The investigation of Mondesire, a well-known

-42-

community and political figure, had also begun under Attorney
General Corbett, and some of the plaintiffs were involved in
that effort.  Plaintiffs responses in opposition to Kane
constituted a defense of their work in the OAG under Corbett.
In addition, Noonan and Feathers were appointed by Governor
Corbett to high positions after they left the OAG.  To deny that
Kane and plaintiffs were involved in a political battle is to
deny reality.

Plaintiffs, in support of their claims, heavily rely
on statements made by persons other than Kane concerning the
release or threatened release of their pornographic e-mails.
These statements, even if credible and otherwise admissible, are
not helpful to plaintiffs' claims since government officials may
not be held liable under § 1983 on a theory of respondeat
superior for constitutional injuries inflicted by subordinates.
Monell, 436 U.S. at 690-92.

First, plaintiffs refer to the statements of OAG
employees James Barker and David Tyler, as recounted by Fina
friends and former OAG employees Glenn Parno and Christopher
Carusone, to argue that Kane threatened to release their
pornographic e-mails.  Barker volunteered to Parno in February or
March 2014 that "they found the porn."  Barker told Parno during a
second conversation in August 2014 that Kane was going to release

the e-mails because of "her battles with Fina [who] keeps making her look bad in the press."  Barker asked Parno to tell Fina to "stop running to the press."  Around the same time, Tyler told Parno that Kane was going to release the pornographic e-mails because of her battles with Fina.  He asked Carusone to speak with Fina about coming to a "truce" with Kane and advised that "[p]eople are going to get hurt."  Carusone immediately called Fina to relay the conversation.  Plaintiffs cite no evidence to show that any of Barker's statements to Parno or any of Tyler's statements to Parno and Carusone about the e-mails were directed, authorized, or caused by Kane.  Plaintiffs, we note, did not depose Tyler in this action.

        Plaintiffs also reference the statements of four people unaffiliated with the OAG as evidence that Kane threatened them.  Former Wayne County District Attorney Mark Zimmer told Fina in March 2014 that the OAG "has these [pornographic] e-mails and they are threatening the Corbett Administration, and you're on them too."  Newspaper reporter Brad Bumsted with the Pittsburgh Tribune-Review told Fina that the RTKL requests were a set up.  Newspaper reporter Craig McCoy with The Philadelphia Inquirer told Fina that "press people from the A.G.'s Office are circulating in the Capitol and the Capitol press room" and instructing the press to make RTKL request for Fina and his "circle."  Finally, Dennis

-44-

Rodney, a career journalist and former Corbett spokesperson, told Fina he received "calls, the Kane people are planting this and telling people to file these Right-to-Knows."  Again, the record is devoid of any evidence that Kane directed, authorized, or caused them to say what they did about the e-mails.  In sum, these third-party statements, assuming they are credible and otherwise admissible, cannot be used to support liability against Kane under § 1983.

Significantly, four of the plaintiffs, Noonan, Sheetz, Feathers, and Fina, acknowledge that there would be no liability under § 1983 had all the pornographic or offensive e-mails of all senders and recipients been released.[18]  They complain only about the selective release or threatened release of their e-mails.  We see no reason whatsoever why plaintiffs have a viable claim under § 1983 based on selective release or threatened release of the

_____

18.     Plaintiffs Noonan, Sheetz, Feathers, and Fina state the following on page 29 of their brief (Doc. # 144):

> Judge Carpenter further stated that 'it is my belief that <u>all of the inappropriate images and information related [to the e-mails] should be appropriately released. The materials should not be selectively released</u>. The materials should not be released unless the Attorney General can prove that the named individual received and opened the emails.' Id. <u>Plaintiffs have endorsed that position all along</u>. (emphasis added).

e-mails when they acknowledge no such claim would exist if all the pornographic or offensive e-mails of all senders and recipients had been made public.[19]

We will grant the motion of Kane for summary judgment against Fina and Costanzo on Count II and her motion for summary judgment against Noonan, Feathers, Sheetz, Fina, and Costanzo on Count VI.

VI

Fina and Costanzo first claim in Count III that Kane conspired with Miletto, Morrow, and Brennan to retaliate against them by leaking the confidential CUES-Mondesire grand jury material and fabricating the June 6, 2014 Philadelphia Daily News article about the Mondesire investigation.  Brennan and Morrow are not defendants.

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive [the plaintiff] of his constitutional rights."  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293-94 (3d Cir. 2018) (internal quotations omitted).  "After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, . . . the plaintiff

_____

19.      The plaintiffs do not contend that the selective release or threatened release was based on their race, gender, or other invidious classification.

must provide some factual basis to support the existence of the elements of conspiracy: agreement and concerted action." Id. at 295.

As we have repeatedly stated, for retaliatory speech to be actionable under § 1983, there must be a "threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." Mirabella, 853 F.3d at 651; see also Noonan, 698 F. App'x at 53 (quoting Suarez, 202 F.3d at 687). We reiterate that defamatory statements or accusations, particularly in the political arena, are insufficient. See Koren, 586 F. App'x at 888; see also Paul, 424 U.S. 693. Fina and Costanzo have not made the showing necessary to succeed on an actual underlying claim for First Amendment retaliation in connection with the CUES-Mondesire leak or the Philadelphia Daily News article.

Even if Fina and Costanzo could succeed against Kane on an underlying claim for First Amendment retaliation, they cite no evidence to support the existence of an agreement to take a concerted action to deprive them of a federally protected right. See Jutrowski, 904 F.3d at 293-95. That is, there is no evidence that Kane, Morrow, Brennan, or Miletto agreed to leak the CUES-Mondesire grand jury material or fabricate the June 6 Philadelphia Daily News article so as to constitute a "threat,

coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow."  See Mirabella, 853 F.3d at 651; see also Noonan, 698 F. App'x at 53 (quoting Suarez, 202 F.3d at 687).

According to Peifer, Miletto contacted him in March 2014 to tell him about the next big story to hit the press for "non-prosecution."  Peifer shortly thereafter recorded Miletto's statement about the OAG's 2009 investigation into Mondesire. Peifer did this at Kane's direction.  There is no dispute that Miletto's statement included confidential information from the CUES-Mondesire grand jury investigation and that Kane leaked the substance of the statement to Philadelphia Daily News reporter Christopher Brennan two months later in order to discredit Fina and Costanzo.

Nonetheless, plaintiffs cite nothing in the record to dispute that the only interaction Miletto, a lower level OAG Special Agent, had with Kane occurred during a meeting on an unrelated investigation and in passing when Kane visited the OAG regional office where Miletto worked.  No reasonable juror could find based on the record before this Court that Kane and Miletto ever agreed to leak the CUES-Mondesire grand jury material or to fabricate any information about the investigation.  Nor could a

reasonable juror find that the object of such an agreement was to stop Fina and Costanzo from criticizing Kane in the press.

Fina and Costanzo also claim in Count III that Kane and Miletto conspired to threaten them physically in order to prevent them from testifying before the grand jury investigating the CUES-Mondesire leak.  Fina's and Costanzo's reliance on the factual findings of Judge Carpenter in his December 14, 2014 opinion in support of this conspiracy claim is misplaced.  Judge Carpenter never held a full evidentiary hearing before entering the protective order on August 27, 2014 and in any event based his order on what was said at a hearing on August 25, 2014, a day before the elevator incident on August 26, 2014.  Significantly, he never at any time heard testimony from Kane or Miletto about the events of that date or about any intimidation.  At a hearing in October after which he denied a motion for reconsideration, he rejected the request of the OAG to call Fina and Costanzo. Instead, he relied on the hearsay testimony of George Kadish, a retired Pennsylvania State Trooper helping Special Prosecutor Carluccio investigate the leak, who "relayed" what Fina and Costanzo had told him.  Kadish was never deposed.

While it is understandable that Judge Carpenter found reason to act quickly to protect the integrity of the grand jury, even if predicated on hearsay, his general findings under the

circumstances cannot be used in a § 1983 conspiracy action against
Kane and Miletto since he never held a full hearing, never gave
them an opportunity to be heard, and never made any findings with
respect to any interaction between them.   In sum, Judge Carpenter's
findings do not support the proposition that Kane and Miletto
conspired to intimidate Fina and Costanzo before they testified in
front of the grand jury on August 26, 2014.

We will grant the motion of Kane and Miletto for summary
judgment against Fina and Costanzo on Count III.

VII

We end with plaintiffs' argument that Kane violated the
Pennsylvania RTKL by releasing their pornographic or offensive
e-mails and as a result she has no First Amendment protection.
This argument is without merit.

The Pennsylvania RTKL generally requires Commonwealth
and local agencies to release information about or relating to
their operation upon the request of the public.   See 65 P.S.
§§ 67.101, et seq.   There are of course several limitations.   For
example, and particularly applicable here, records that have not
been "created, received or retained pursuant to law or in
connection with a transaction, business or activity of the agency"
are not required to be provided upon public request.   65 P.S.
§ 67.102.   Similarly, records that become part of an internal

investigation into the violation of agency policies need not be disclosed.  See 65 P.S. §67.708.

        As noted, the OAG hired outside attorney Sara Yerger, Esq. to review the requests of third parties for the e-mails. Yerger denied the requests for the e-mails.  She determined that the e-mails were not "created, received, or retained pursuant to law in connection with a transaction, business or activity" of the OAG.  See 65 P.S. § 67.102.  She also noted that the e-mails had become part of an ongoing internal investigation into the violation of agency policies and were therefore exempt under the RTKL.  See 65 P.S. §67.708(b)(l7)(vi)(A).  The Commonwealth Court of Pennsylvania agreed that third parties, such as the news media, had no right under the statute to the e-mails.  See Pa. Office of Atty. Gen. v. Bumsted, 134 A.3d 1204, 1209 (Pa. Commw. 2016).

        The fact that third parties may not obtain documents or information under the RTKL has no bearing on whether a government official or agency may release documents or information.  The heads of Commonwealth agencies, such as Kane, have the discretion to release records exempt from disclosure under the RTKL if they decide "that the public interest favoring access outweighs any individual, agency or public interest that may favor restriction of access."  65 P.S. § 67.506(c)(3).

Plaintiffs argue their pornographic or "inappropriate" e-mails are of a personal nature.  Consequently, they contend Kane's failure to provide notice and a meaningful opportunity to object to the release of the e-mails violated plaintiffs' due process rights under the United States Constitution and the Constitution of the Commonwealth of Pennsylvania regardless of whether Kane had discretion to release them under the RTKL. According to plaintiffs, Kane's failure to provide them with notice and a meaningful opportunity to object rendered the release of the e-mails unlawful conduct, not protected speech implicating Kane's First Amendment rights.  In our view, this particular argument is dubious at best.

A private party's request to a state agency for the personal information of an individual may implicate the privacy and due process rights of that individual.  See Pa. State Educ. of Ass'n ex rel. Wilson v. Commonwealth, Dep't of Cmty. & Econ. Dev., 50 A.3d 1263, 1276 (Pa. 2012).  However, plaintiffs cite no authority which suggests that Kane, the head of an agency, was required to provide notice and a hearing before releasing information to the public about government employees' use of government computers on government time to send and receive pornographic or offensive e-mails.

Finally, this RTKL argument of plaintiffs also fails because a viable claim under § 1983 requires a deprivation of a right, privilege or immunity under the Constitution or law of the United States.  42 U.S.C. § 1983.  A violation of a state law such as the Pennsylvania RTKL will not alone suffice.  See Paul, 424 U.S. at 699-700.  Otherwise many state law causes of action would be transmuted into § 1983 actions.

### VIII

Accordingly, the Court will grant the motion of defendant Kathleen Kane for summary judgment against plaintiffs E. Marc Costanzo and Frank Fina on Counts II and III of the First Amended Complaint and against plaintiffs Frank Noonan, Randy Feathers, Richard A. Sheetz, Jr., E. Marc Costanzo, and Frank Fina on Count VI.  We will also grant the motion of defendant Michael Miletto against plaintiffs E. Marc Costanzo and Frank Fina on Count III.